FRANK H. AINSCOW, Petitioner, and HARRY MACULLEY, Party in Interest,

*vs.*

MAYNARD S. ALEXANDER, Administrator of the Estate of Allen H. Ainscow, Deceased; and MAYNARD S. ALEXANDER, Administrator of the Estate of Jennie M. Ainscow, Deceased.

*Superior Court, On Appeal, August 22, 1944.*

LAYTON, C. J., and RODNEY, J., sitting.

*Walter J. Willis,* for petitioner.

*Ivan Culbertson,* for Jennie M. Ainscow's administrator.

*Joseph A. L. Errigo,* for Harry Maculley.

LAYTON, Chief Justice, delivering opinion of the court:

This is an appeal from a decree in distribution entered by the Orphans' Court for New Castle County by which the residue of the personal estate of Allen H. Ainscow, deceased, was directed to be paid to the administrator of the estate of his putative widow against the claim of his next of kin, the controversy growing out of the disputed validity of the marriage of the decedent with Jennie M. Alexander, who had obtained a divorce from her husband in Reno, Nevada.

The material facts are these: Allen H. Ainscow, a childless widower, lived for years in the City of Wilmington. Mayrice F. Alexander and Jennie M. Alexander were married in Wilmington in 1901, and lived together as man and wife in New Castle County until 1935, when they separated. Of the marriage there were born, or at least survived, three children, one of them being Maynard S. Alexander, the respondent. After the separation the husband continued to live in Wilmington. The wife, after a certain period

of residence in New York, a circumstance not material for there is no suggestion that she ever acquired a domicile in that State, made her home in Lewes, in Sussex County, Delaware.

In June, 1937, Mr. Ainscow sought out the son, Maynard, told him that his mother had agreed, at his persuasion, to take residence in Reno, Nevada, for the purpose of obtaining a divorce, asked the son's consent to his mother's marriage with him, and gave him $500.00 in cash to be used by him for the expenses of the undertaking. The son gave his consent, took the money, and arranged for the journey of his mother to Reno, her stay there, and for the services of an attorney.

Mrs. Alexander, in due course, filed a petition for divorce in Reno, alleging extreme cruelty as ground therefor; and on August 9, 1937, a decree of divorce was entered by the Nevada court. Immediately Mrs. Alexander returned to Delaware, and on August 14, 1937, married Mr. Ainscow in Sussex County, and thereafter made their home in Wilmington.

Mr. Ainscow died intestate on June 24, 1938. At the request of the reputed widow, she renouncing her right, letters of administration were granted to her son, Maynard, the respondent. Mrs. Ainscow died intestate on September 25, 1942, before the estate of Mr. Ainscow had been finally settled, and letters of administration upon her estate were also granted to the respondent. The final administration account passed by the administrator on the estate of the deceased husband, showed a distributive balance exceeding $30,000.00, payable, *prima facie,* to the administrator of the deceased wife's estate, she, as widow, being entitled absolutely to the residue of the personal estate of her deceased husband in the absence of children of the intestate or descendants of such children. *Section 3847, Rev. Code, 1935.*

Frank Ainscow, a brother of the deceased husband, Harry Maculley another of the next of kin joining with him, invoked the jurisdiction of the Orphans' Court for New Castle County under *Chapter 143, Volume 42, Delaware Laws*, which extends the jurisdiction of the Orphans' Court of the State, when invoked, to the distribution of the assets of decedents' estates among those legally entitled thereto. The petition challenged the validity of the Nevada decree and the subsequent marriage of Mr. Ainscow with Mrs. Alexander on the ground that the decree had been obtained by collusion and by fraud practiced upon the Nevada court, and in defiance of the provisions of *Section 3525* of the *Revised Code*, which, after declaring that full faith and credit shall be given in all of the courts of this State to a decree of annulment of marriage or divorce by a court of competent jurisdiction in another State where jurisdiction of the court has been obtained in substantial conformity with our law, specifically provides that:

"If any inhabitant of this State shall go into another State, territory or country in order to obtain a decree of divorce for a cause which occurred while the parties resided in this State, or for a cause which is not ground for divorce under the laws of this State, a decree so obtained shall be of no force or effect in this State."

The respondent asserted the validity of the Nevada decree in the state of its rendition, and its consequent binding force in this State under the *Federal Constitution (Art. 4, § 1)* citing, as decisive authority, *Williams v. North Carolina,* 317 *U.S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279, 143 *A. L. R.* 1273; and he further contended that the petitioners, heirs at law of the deceased husband, and as such in privity with him, were estopped to contest the validity of the Nevada decree, as the deceased intestate himself would have been estopped.

The court below, in an opinion reported 27 *Del. Ch.* 423, 34 *A. 2d* 593, was of opinion that the term "extreme cruelty", as used in the Nevada statute [*Comp. Laws* § 9460], and the

phrase, "extreme cruelty," such as to endanger life or health, "or to render cohabitation unsafe," as in our statute, were synonymous. But the testimony given before the Nevada court was not included in the record, and we are unable to say whether the facts presented to the Nevada court as amounting to extreme cruelty would constitute extreme cruelty as that cause for divorce is defined in our statute. *Section* 3500 (*d*) *Rev. Code,* and as construed by this court in *McClenahan v. McClenahan, 2 Boyce,* 599, 80 *A.* 677.

The court below held correctly that the Nevada decree was of no force or effect in this State for the reason that Mrs. Alexander, an inhabitant of this State, went to Nevada to obtain a divorce for a cause which occurred while she and her husband resided here.

The Constitution of the United States confers no power whatever on the Federal Government to regulate marriage, the dissolution of marriage, the effect of marriage upon the property rights of spouses, present or prospective, or the devolution of property by will or in the case of intestacy, in the states. These are matters which remain subject to the control of the state legislatures, and so long as a person remains a citizen of a state he is bound by its laws in these respects. To obtain jurisdiction in an action for divorce, the court must in some way acquire jurisdiction over the marriage status. Jurisdiction over the subject matter rests upon domicile, and it is recognized generally that at least one of the parties to the action for divorce must have domicile, or residence *animo manendi*, in the divorce forum, for a state can have no legitimate concern with the matrimonial status of two persons, neither of whom lives within its boundaries. Where the requisite of *bona fide* domicile of at least one of the parties is wanting, the court is without jurisdiction, even if the parties consent; and where neither of the parties has a domicile in good faith in the state of the rendition of the judgment at the time the suit was begun,

the decree may be impeached and denied recognition on that ground in another state notwithstanding the recital in the decree or record from the other state of the jurisdictional fact of domicile. The dominating principle is that marriage relation is so intertwined with public policy that the consent of the parties is powerless to dissolve it contrary to the laws of the domicile; and, therefore, the parties cannot accomplish the dissolution of the marriage by appearing in a court foreign to the domicile, and wholly wanting in jurisdiction, and thereafter compel the courts of the domicile to give effect to the judgment against the prohibition of the domicile. *Andrews v. Andrews,* 188 *U.S.* 14, 23 *S. Ct.* 237, 47 *L. Ed.* 366; 17 *Am. Jur.* 278, 559; 1 *Beale, Confl. Laws,* 476.

Domicile means a relationship between a person and a place, a place where one has his real permanent home. The essentials of domicile of choice are the fact of physical presence at a dwelling place, and the intention to make that place home. There must be a concurrence of fact and intent. The intention must be that of permanent, or indefinite, living at a given place, not for a temporary or special purpose, but with the present intention of making that place home unless or until something unexpected or uncertain shall induce the adoption of some other permanent home. Negatively expressed, there must be an absence of any present intention of not residing at the place permanently or for an indefinite time. *New York Trust Co. v. Riley,* 24 *Del. Ch.* 334, 16 *A.* 2d 772.

Mr. and Mrs. Alexander were domiciled in Delaware. The domiciles, whether matrimonial or individual, were in this State. It does not appear that they ever lived together as man and wife in Nevada. Mr. Ainscow and Mrs. Alexander wanted to marry, and since the laws of this State were not adapted to an early accomplishment of their purpose, she availed herself of the more generous laws of Nevada. She went to that State for a special purpose, in-

tending to stay there the required six weeks, or, perhaps, such further time as was necessary to obtain a divorce; and then she meant to return to this State. She had no intention to reside in Nevada permanently or for an indefinite time; and it is entirely clear on the undisputed facts of the case that she never acquired a good faith domicile in the State of Nevada.

It is generally held that the word "reside" involves the idea of domicile; and there is no reason to think that the word "resided", as used in the Nevada statute, means other than that the plaintiff in a suit for divorce must have acquired a *bona fide* domicile in the State. This is sufficiently shown not only by the meaning usually attributed to the word "reside", but also by the language of the petition for divorce filed by Mrs. Alexander in the Nevada court and of the decree of the court. The petition alleged that the plaintiff was a resident of the State of Nevada, and "now resides, and during all of the time for six weeks last past, and immediately preceding the filing of this complaint, continuously has resided in and been an actual and *bona fide* resident of and domiciled in the State of Nevada," and the decree, in this particular, was in the same language.

The decree was passed on August 9, 1937. Within five days she had made the long journey from Reno to this State and had married Mr. Ainscow according to plan. The presumption in favor of the validity of the Nevada decree was effectively rebutted by the evidence given before the court below. The case was not, in fact, one in which the legislature of Nevada had authorized its courts to act. On the contrary, the Nevada court was deceived, and we must assume that it would have refused to act, for it had no authority to act, if it had appeared that Mrs. Alexander had no intention to reside in Nevada permanently, or for an indefinite time, but was there temporarily, and for the special purpose of obtaining a divorce in fraud as well of the law of Nevada as of the state of which she remained a domiciliary. *Andrews v. Andrews*, 176 *Mass.* 92, 57 *N.E.* 333.

The Nevada court had no authority to decree a divorce between citizens of Delaware, and the courts of this State are not bound to accord full faith and credit to the Nevada decree, but may deny recognition on the ground that the Nevada court never had jurisdiction of the matrimonial status as neither of the parties was domiciled in the State of Nevada. In fact the courts of this State have no choice in the matter. The public policy of the State with respect to the questions is embodied in the statute, and the courts are affirmatively forbidden to accord faith and credit to a divorce obtained elsewhere by domiciliaries of this State in the circumstances shown.

The statute, in precise or similar language, is found in the laws of Massachusetts, Maine and New Jersey, and generally has been sustained as a constitutional exercise of the legislative power of the State. The Massachusetts statute was upheld by the Supreme Court of the United States in *Andrews v. Andrews, supra,* the court observing that it was but the exercise of an essential attribute of government, to dispute the possession of which would be to deny the authority of the State to legislate over a subject inherently domestic in its nature, and upon which the existence of civilized society depends; and it was pointed out that the statute was not directed against the enforcement of divorces obtained in other states as to persons domiciled in such states, but only against the execution in Massachusetts of decrees of divorce obtained in another state by persons domiciled in Massachusetts who go into another state for the purpose of practicing a fraud on the laws of the state of their domicile.

It is not asserted or suggested that the appearance of the defendant in the divorce proceeding was adversary, or that the question of domicile was contested there. See *Davis v. Davis,* 305 *U.S.* 32, 59 *S. Ct.* 3, 83 *L. Ed.* 26, 118 *A. L. R.* 1518. The jurisdictional defect arising from the fact that neither party was domiciled in Nevada was not cured by

the defendant's appearance so as to give to the decree extra territorial effect. *Andrews v. Andrews, supra.*

The case before us is not within the reach of the decision in *Williams v. North Carolina, supra.* In that case a married man and a married woman, domiciled in North Carolina, after obtaining decrees of divorce in Nevada upon constructive service of process with no appearance on behalf of the defendants, married in that State, and returned to North Carolina to live. They were convicted in North Carolina of bigamous cohabitation, and the convictions were upheld by the Supreme Court of the State. 220 *N.C.* 445, 17 *S.E.* 2d 769. The Supreme Court of the United States granted *certioraries,* 315 *U.S.* 795, 62 *S. Ct.* 918, 86 *L. Ed.* 1196, and in that court counsel for the State of North Carolina did not insist on the point that the appellants never had acquired *bona fide* domiciles in Nevada, but admitted that there was probably enough evidence in the record to require that they be considered as having been actually domiciled in Nevada. The insistence was that Nevada had not acquired jurisdiction over the defendants in the divorce action by constructive service of process, with no appearance, and the State of North Carolina was entitled to enforce the policy of its laws regardless of the question of domicile, under *Haddock v. Haddock,* 201 *U.S.* 562, 26 *S. Ct.* 525, 50 *L. Ed.* 867, 5 *Ann. Cas.* 1. Again, the case in the state court was tried and submitted to the jury upon the theories of lack of personal service on or appearance by the defendants in the Nevada actions, and lack of *bona fide* domiciles of the plaintiffs in Nevada. The verdict was general, and the court felt unable to determine from the record that the appellants had not been convicted on the theory that the Nevada decrees were invalid for want of jurisdiction over the defendants. The decision in the *Haddock* case was expressly overruled, and the majority of the court held that for the purpose of the limited issue before the court, the case must be treated as if the appellants had resided in

Nevada for a term of years and had long ago acquired a permanent abode in that state.

The decision, as we understand it, does not deny the right of a court to refuse extra territorial recognition to a decree of divorce rendered in a state in which neither party to the action had a domicile in good faith.

The court below concluded, however, that while the Nevada decree was of no force or effect in this State, yet the petitioners were estopped to assert its nullity for the purpose of invalidating the marriage, they being in privity with the deceased husband who would himself have been estopped. The decision was based, in great part, on the case of *In re Davis' Estate*, 38 *Cal. App.* 2d 579, 101 *P.* 2d 761, 764, 102 *P.* 2d 545, in a District Court of Appeal for the State of California. In that case, one Davis urged the respondent to go to Nevada to establish a residence for the sole purpose of obtaining a divorce, and then to marry him. He promised to pay her expenses and the cost of the divorce; and went to Reno himself and was active in the preparation of the case. He married the respondent on the day the divorce was granted, and the couple returned to California where they made their home. Davis died; and his surviving son by a former marriage began a proceeding to determine his rights in his deceased father's estate as against the respondent, the reputed widow. The court acknowledged a scarcity of authority, but were "inclined to the view" stated briefly in *Elliott v. Wohlfrom*, 55 *Cal.* 384, a case not subsequently cited, that since a former husband could not attack a judgment of divorce on the ground that it was obtained by his own fraud, the grantees of the husband were in no better position than he, and they would be estopped from attacking the judgment; and the conclusion was that the son, as heir, should not be permitted to profit by the fraud practiced by the father. The participation in the fraud by the wife was ignored; there was no statutory declaration of public policy, as in this State;

and we must decline to accept the decision as a satisfactory authority. See *In re Hancock's Estate,* 156 *Cal.* 804, 106 *P.* 58, 134 *Am. St. Rep.* 177.

In *Chase v. Chase,* 6 *Gray* (Mass.) 157, the plaintiff, Mary Chase, sued the defendant, her father-in-law, for slander. The preliminary question was whether she could maintain her action in her own name and right as a *feme sole,* and this depended upon the validity of a decree, or decrees, of divorce obtained in Maine, for a cause which would not be a ground for divorce in Massachusetts where the parties were domiciled. It was held that a decree of divorce, obtained in another state, between parties residing in Massachusetts, for a cause which would not be a cause for divorce in the State of the domicile of the parties was void in Massachusetts by the statute, even if the other party appeared and answered to the suit; and that the plaintiff, not being a *feme sole,* could not maintain the action.

In *Smith v. Smith,* 13 *Gray* (*Mass.*) 209, the plaintiff domiciled in Massachusetts, went to Indiana and there obtained a decree of divorce on the ground of desertion for a period of time which would not have warranted a divorce in Massachusetts. He returned to Massachusetts, and later sued for divorce in that State, alleging adultery. The defendant wife moved to dismiss the libel on the ground that the Indiana decree had dissolved the marriage. Chief Justice Shaw, speaking for the court, after saying that the divorce was obnoxious to the Massachusetts statute, both on the ground that it had been obtained for a cause which had occurred in Massachusetts while the parties resided there, and for a very short term of desertion which would not have been a legal ground in Massachusetts, continued:

"If this were a mere private action, or suit in which the personal rights of the parties alone were concerned, there would be strong reason for applying the doctrine of estoppel, to the act of the husband, in resisting the present motion of the wife. But a suit for divorce is of a very different character; it is one in which the public have an

interest, and in the conduct and result of which the best interests of society are concerned. Where proceedings in divorce are rightly commenced and conducted, decree of divorce fixes the status of the parties for all purposes. But if the statute declares the divorce in Indiana wholly void and without force in this state, it cannot be made good by the conduct of either or both the parties. Should the husband marry again here or elsewhere, and come into this state, would he not be liable to public prosecution for bigamy or adultery; would not such second marriage be adultery as against the former wife; and would not his children, if any, be illegitimate? Would not the same consequences follow, should the wife marry? But another aspect of the question leads to the same result. Marriage is undoubtedly a contract, but it is a contract sanctioned by law, controlled by considerations of public policy vital to the order and harmony of social life, and in its nature indissoluble, except by violation of duty on the one part, to be taken advantage of in a special manner, provided by law, on the other. Neither party can do any act, by way of release, grant, stipulation or agreement, to dissolve such contract; and yet by any of these acts one could estop himself in a matter of private right. Without saying that in no case can the law or principle of estoppel apply in matters of divorce—as in regard to the service of process, or admissions or confessions of fact, where all suspicion of collusion is effectually excluded—we are of opinion that the libellant is not estopped from insisting that the decree of divorce in Indiana is void in this commonwealth, and therefore that there is no ground for dismissing this libel, for the alleged cause that the relation of husband and wife no longer subsists between the parties. * * *."

In *Andrews v. Andrews,* 176 *Mass.* 92, 57 *N.E.* 333, 335, the facts were these: Andrews and his wife, Kate, were domiciled in Boston, Massachusetts. Andrews went to South Dakota for the purpose of getting a divorce, intending to return to Massachusetts as soon as he had done so. The wife, Kate, received notice, appeared by counsel, and filed an answer denying that the petitioner was a *bona fide* resident of South Dakota, denying that she had deserted him, and setting up cruelty on his part toward her. By agreement, upon the payment to her of a sum of money, Mrs. Andrews withdrew her appearance, and made no further contest. The decree of divorce was granted. Andrews returned to Massachusetts, soon after married Annie, and they lived together as man and wife in Boston until he died

leaving two children as issue of the marriage. Both Kate Andrews and Annie Andrews applied for letters of administration. It was held that the decree rendered in South Dakota was void in the State of Massachusetts, under a statute similar to our own, and that Kate Andrews was entitled to administer the estate.

The late Justice Holmes, then Chief Justice of Massachusetts, said this:

"The commonwealth having intervened by legislation, the appellant gets the benefit of it, irrespective of any merits of her own. The possibility of a distinction such as was sanctioned by *In re Ellis' Estate*, 55 *Minn.* 401, 56 *N. W.* 1056, 23 *L. R. A.* 287 [43 *Am. St. Rep.* 514], upholding the divorce as between the parties, and so far as concerns property rights, but treating it as void against the state, and for the purposes of the criminal law, is done away with by the act. It is settled that in a case within the statute the divorce is to be treated here as void for all purposes. *Chase v. Chase*, 6 *Gray* [*Mass.*] 157, 160. It is settled that there is no estoppel, even as against the party instituting the foreign proceedings. *Smith v. Smith*, 13 *Gray* [*Mass.*] 209, 210. If the appellant's conduct amounted to connivance, as found, so that she could not have maintained a libel for adultery on the ground of the second marriage, that does not go far enough to constitute an estoppel. *Loud v. Loud*, 129 *Mass.* 14, 19."

In *Matter of Ferry's Estate*, 155 *Misc.* 198, 279 *N. Y. S.* 919, it appeared that John F. Ferry died intestate, leaving a reputed widow to whom letters of administration on her estate were granted. A son of the decedent applied to revoke the letters on the ground that the administratrix was not the decedent's widow. The facts were these: The respondent administratrix was married to one Cotter in the State of New York. By reason of his treatment she was compelled to leave her home, and removed to New Jersey, acquiring there a legal domicile. At the request of Ferry, the decedent, she brought in New Jersey an action for divorce against Cotter, domiciled in New York on the ground of cruel and inhuman treatment. He was served by publication and did not appear. A final decree of divorce was granted. The decedent, Ferry, paid the expenses of

the divorce and married the respondent in New Jersey, lived there for upwards of a year, and then removed to New York where Ferry died.

The Surrogate held that the son was not estopped from denying the validity of the divorce decree and the subsequent marriage, for to admit estoppel would contravene the public policy of the state which refused to recognize as binding a decree of divorce obtained in a sister state, not the matrimonial domicile, upon grounds insufficient for the purpose in New York, when the defendant lived in New York and was not personally served with process and did not appear in the action.

The *Restatement of the Law of the Conflict of Laws, Sec.* 112, lays it down that "The validity of a divorce decree cannot be questioned in a proceeding concerning any right or other interest arising out of the marital relation either by a spouse who had obtained such decree of divorce from a court which had no jurisdiction, or by a spouse who takes advantage of such a decree by remarrying," but leaves unanswered the question whether the children of a prior marriage, or a third person may be precluded from questioning the validity of a divorce decree in the circumstances described in the section.

Estoppel is a technical term loosely and broadly used. As related to the party claiming the estoppel, it must appear that he lacked knowledge and the means of knowledge of the truth of the facts in question, that he relied on the conduct of the party against whom the estoppel is claimed, and suffered a prejudicial change of position as a consequence; and here we are unable to discover any essential element of the doctrine. As between the immediate parties the woman was in no sense deceived. The prohibition of the statute is plain and knowledge of it was imputed to her. With open eyes she chose deliberately to hold in contempt the law of the state of her domicile, albeit at the persuasion of

the man. As between the heirs of the man and the heirs of the woman, the latter suffered no injury at the hands of the former. Moreover, the state has an interest; and the statute is the expression of its will in aid of the public welfare in an endeavor, at least, to protect the permanency and sanctity of the marriage relation. Private grievances in conflict with the statute will not be heard except, perhaps, in extreme cases. Our decision is confined to the precise facts before us. We leave untouched the question whether circumstances of a compel ing nature would result in a clash of public policies such as to require the public policy declared by the statute to yield to another public policy of greater gravity. Here we have no extraneous circumstances to induce a search for reasons for applying the principle of estoppel, or any kindred principle of preclusion based on connivance or acquiescence. Both the man and the woman, the immediate actors, are dead. We are not confronted with the claim of a surviving wife who, in good faith, married in the belief that her husband had been legally divorced. There are no children of the marriage upon whom the imputation of illegitimacy may be cast, or who may become public charges. On the one hand are the collateral heirs of the man, having a recognized status under the law, who were not participants in the fraud practiced on the Nevada court and in the violation of the law of this State. On the other hand are the children of the woman who chose to flout the law, and one of those children actively abetted her. The assumption that, through some equitable principle of restriction, the woman, despite her defiance of the law, nevertheless acquired something in the nature of a right transmissible to her personal representative, is entirely unacceptable. The practical effect of the decision below is to override the statute, and thereby give to the children of the woman precisely the same benefit that would accrue to them from a valid decree of divorce, notwithstanding the prohibition of the statute. We find no reason why the transgression of the man should be visited on his next of kin, while that of

the woman result in the enrichment of her children. It is still the law that estoppels should be resorted to solely as a means of preventing injustice, and should not be permitted to defeat the law. 19 *Am. Jur.* 602.

Whether legal restrictions on human desires imposed by traditional religious and social creeds are wise, whether the enlarged and pragmatical view held by some with respect to facile dissolution of the marriage tie requires a greater tolerance of foreign decrees of divorce obtained by domiciliaries of this State, are matters within the competency of the legislature to determine; and where the legislature has seen fit to declare a strict public policy in this regard, it is not within the power of the court to whittle it away by decision.

The petitioners were not precluded from asserting that the decree of divorce entered by the Nevada court was of no force and effect in this State, and the consequent invalidity of the marriage. The decree of the court below is reversed with the direction that the respondent, administrator of the estate of Allen H. Ainscow, deceased, pay the distributive balance of the estate, less proper costs, to and among the next of kin of the decedent.