Doris **MITCHELL**, Administratrix of the Estate of Homer Carl Jones, Petitioner, Counter–Respondent,

v.

Betty A. **DiANGELO**, Respondent, Counter–Petitioner.

No. 18199.

Court of Chancery of Delaware, New Castle County.

Submitted: March 30, 2001.
Decided: May 9, 2001.

Sandra W. Dean, Camden, for Petitioner, Counter–Respondent.

Beth B. Miller, Schmittinger & Rodriguez, Dover, for Respondent, Counter–Petitioner.

## OPINION

LAMB, Vice Chancellor.

### I.

H. Carl Jones died intestate on February 11, 2000. On August 8, 2000, Doris Mitchell, Administratrix of his estate, filed a petition asking the court to determine that Carl's only heirs are his two sisters and the children of his pre-deceased siblings. The petition further asks for a determination that respondent, Betty A. DiAngelo, is estopped from claiming that she is Carl's surviving spouse and sole heir under 12 *Del. C.* § 502.[1]

---

1. "The intestate share of the surviving spouse is: (1) If there is no surviving issue or parents of the decedent, the entire intestate estate." 12 *Del. C.* § 502.

The relevant facts are easily stated. Carl and Betty were married in 1951. They had no children together. In June of 1968, Betty sought a divorce in order to marry another man. She consulted Carl's attorney, who arranged for her to go to Alabama, where she obtained a written divorce decree. This document is dated June 28, 1968, and was obtained by her a day or two after she arrived in that state. It is signed by Judge F.O. Whitten, Jr. of St. Clair County, Alabama. The next day Betty married William DiAngelo in Georgia.

Shortly before leaving Delaware for Alabama, Betty signed a written agreement with Carl, that recites his payment to her of $5,000 in property settlement and contains language purporting to release and discharge Carl from any claims she might have against him arising out of or resulting from their marriage "whether by agreement or under any applicable statute" of the State of Delaware (the "Property Settlement Agreement").

Betty also joined Carl in executing a deed conveying the marital residence to a straw party who then reconveyed the property to Carl. On the second deed, recorded in August 1968, Carl is identified as a "divorced man."

Betty and William lived together as husband and wife until William's death in 1987. Betty then began to collect Social Security benefits and a veteran's pension as William's widow. Betty married again on March 2, 1990, but divorced a year later for reasons not of record. Carl never remarried and left no issue.

When Betty learned of Carl's death, she determined that, due to the fact of having been married to Carl for so many years, and notwithstanding the 1968 divorce, she was eligible to receive higher Social Secu-

rity benefits as Carl's "surviving spouse" than she was receiving as William's surviving spouse. As part of the application process, the Social Security Administration asked for a copy of the Alabama divorce decree. It was only when Betty wrote to Alabama for a certified copy that she discovered that Alabama had no official record of her divorce from Carl and that Judge F.O. Whitten, Jr. had been imprisoned for issuing fraudulent "quickie" divorces.

Based on these facts, Betty argues that because the divorce decree was void, her subsequent marriages were void *ab initio*, dictating a finding that she remained Carl's spouse and is entitled to take 100 percent of Carl's intestate estate. The Administratrix contends that Betty should be estopped from denying the validity of the Alabama divorce and her later marriages and, thus, from inheriting Carl's estate. Furthermore, the Administratrix argues that the Property Settlement Agreement serves as a release of all of Betty's claims against Carl's estate. For the reasons discussed below, I conclude that Betty should be estopped from denying the validity of the 1968 divorce and her remarriages. I also conclude that the Property Settlement Agreement should be given effect as a renunciation of Betty's right to any claim of intestate succession in Carl's estate.

## II.

■ The parties have cross-moved under Court of Chancery Rule 56 for summary judgment. Summary judgment will be granted if, viewing the evidence most favorably to the non-moving party,[2] "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[3] The fact that the parties have cross-moved does not

2. *Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990).

3. Ct. Ch. R. 56(c).

alter the standard of review.[4] I note that "the existence of cross motions for summary judgment does not act *per se* as a concession that there is an absence of factual issues."[5]

## A. Effect of her "divorce" and remarriage on Betty's claim to be Carl's "surviving spouse"

■ As a purely legal matter, there is no doubt that Betty's marriage to Carl was not dissolved by the fraudulent "divorce" and, thus, her later marriages were void and a legal nullity.[6] It is also the case that Delaware decisions have consistently interpreted related provisions of the probate code (*e.g.*, the "Surviving spouse's allowance" now found at 12 *Del. C.* § 2308) as an "absolute right" of a surviving spouse that exists even if the surviving spouse was living apart from the decedent at the time of his or her death.[7]

These early cases often reflected an understanding that the public policy of Delaware was strictly set against the facile termination of lawful marriages. For example, in *Ainscow v. Alexander*,[8] the decedent had paid for the woman, a domiciliary of Delaware whom he later married, to travel to Nevada for the purpose of obtaining a divorce from her first husband. Some years later, he died intestate and without issue. The woman (and, after her death during the administration of the estate, her son) asserted her claim to the entire estate as the decedent's surviving spouse. Notwithstanding the fact that the decedent was substantially involved in procuring the Nevada divorce, the court permitted the decedent's collateral relations to contest the validity of the Nevada divorce and, thus, the decedent's marriage. The effect of the decision was to exclude the decedent's wife (and, later, her son) from participating in the intestate estate upon proof that the marriage was void. The court explained its result as follows:

> As between the heirs of the man and the heirs of the woman, the latter suffered no injury at the hands of the former. Moreover, the State has an interest; and the statute is the expression of its will in aid of the public welfare in the endeavor, at least, to protect the permanency and sanctity of the marriage relation.[9]

There are many other older decisions of a similar character, such as *Loper* and *Pike*, that appear to be animated largely by the strictness of Delaware's laws of marriage and divorce.[10]

---

**4.** *Continental Ins. Co. v. Rutledge & Co., Inc.*, Del. Ch., 750 A.2d 1219, 1227 (2000).

**5.** *United Vanguard Fund v. Takecare, Inc.*, Del. Supr., 693 A.2d 1076, 1079 (1997).

**6.** *Loper v. Loper*, Del.Super., 170 A. 804 (1934).

**7.** *Pike v. Satterthwaite*, Del.Super., 15 A.2d 430 (1940). *See also In re Estate of Mayors*, Del.Ch., 385 A.2d 734 (1978). I note, however, that these cases do not address the circumstance of a decedent and a "surviving spouse" who thought themselves divorced as the result of some decree later discovered to be void or voidable.

**8.** Del.Super., 39 A.2d 54 (1944).

**9.** *Id.* at 61.

**10.** *See also In re Estate of McCracken*, Del.Ch., 219 A.2d 908 (1966). In *Estate of McCracken*, decedent married second wife in 1960 without first obtaining a divorce from first wife. *Id.* at 909. Second wife did not discover that decedent had lied about being free to marry until 1963; thereafter, decedent obtained an invalid divorce in Alabama and remarried his second wife in Virginia. *Id.* at 910. Because the second wife, at first, married decedent in good faith, the court applied the doctrine of equitable estoppel to block a claim through decedent by decedent's first wife and children to real estate purchased by decedent and second wife in 1960; however, the court denied the doctrine's application to property purchased in 1964 after the Alabama divorce. *Id.* at 911.

The radical and ubiquitous change in public attitude toward divorce in the last half century, and the vastly different set of laws now in effect in this and other states, is reflected in more modern opinions in the area. These changes are discussed in the thoughtful decision of the New Jersey Supreme Court in the case of *Kazin v. Kazin*.[11] In that case, the court, reversing earlier precedent, held that a husband who had participated in his wife's procurement of a Mexican divorce was estopped from relying on the invalidity of that divorce as grounds to attack his own marriage. The court said:

> Full weight should be given the legislative objectives governing divorce, which reflect a genuine concern for the realities of the marital relationship and allow the expeditious, orderly, and fair dissolution of destroyed marriages. . . . There remains little if any, interest in encouraging the resurrection of deceased marriages, even if pronounced dead by other tribunals whose processes are not completely consistent with our own. In this context, the estoppel doctrine itself should be a reflection of that public policy and be applied, or not, in accordance with its demands in the circumstances of the given case.[12]

At least in situations involving divorce and remarriage, modern Delaware cases have also applied principles of equitable estoppel to avoid a rigid or uncritical enforcement of a strictly legal right to inherit property that would result in unfairness to another party. For example, Chancellor Chandler recently confirmed by order a master's report recommending that, in order to achieve fairness and justice between the parties, a first spouse be estopped from claiming to be the surviving spouse of a decedent who had "remarried" without benefit of a divorce.[13] Similarly, courts in other jurisdictions also have relied on principles of estoppel or preclusion to prevent persons claiming the status of a "surviving spouse" from denying the validity of void or voidable divorce decrees obtained by them.[14] And legislatures in other states have adopted amendments to their probate codes to that effect.[15]

**11.** N.J.Supr., 81 N.J. 85, 405 A.2d 360 (1979).

**12.** *Id.* at 367.

**13.** *In re Estate of Marion J. Golden*, Del. Ch., Reg. of Wills No. 100681, 1997 WL 695567, Kiger, M. (Sept. 19, 1997), *appr'd without exception*, Chandler, C. (Oct. 17, 1997) (ORDER).

**14.** *See In the Matter of the Estate of Birch*, 140 Cal.App.3d 776, 780, 189 Cal.Rptr. 796 (1983) (stating, "[A] remarriage estops the party entering into it from denying the validity of a previous divorce"); *see also Flammia v. Maller*, 66 N.J.Super. 440, 169 A.2d 488 (App.Div. 1961).

**15.** *See In re Rathscheck's Estate*, Ct.App., 300 N.Y. 346, 90 N.E.2d 887 (1950) (applying New York statute that states, "No distributive share of the estate of a decedent shall be allowed under the provisions of this article . . . to a spouse who has procured without the state of New York a final decree or judgment dissolving the marriage with the decedent, where such decree or judgment is not recognized as valid by the law of this state"). The Uniform Probate Code has similarly addressed these concerns in § 2–802(b) which provides that "a surviving spouse does not include (1) an individual who obtains or consents to a final decree or judgment of divorce from the decedent or an annulment of their marriage, which decree or judgment is not recognized as valid in this State . . .; (2) an individual who, following an invalid decree or judgment of divorce or annulment obtained by the decedent, participates in a marriage ceremony with a third individual; or (3) an individual who was a party to a valid proceeding concluded by an order purporting to terminate all marital property rights." *Unif. Probate Code* § 2–802(b) (1990), 8 U.L.A. 210 (1998). While Delaware has adopted several provisions of the UPC, it has not adopted this section.

The question, then, is whether, as between Betty and Carl's Estate, the facts are such that she should be estopped or precluded from denying the validity of the 1968 divorce and of her subsequent marriages. If so, she will be unable to prove her status as Carl's surviving spouse.

For a variety of reasons, I conclude that Betty should be so estopped or precluded. First, it is clear that to do so would work no injustice or hardship on Betty. On the contrary, she both actively sought the 1968 divorce and enjoyed substantial benefits as result of it. Most importantly, she felt free to marry William and lived with him as husband and wife for nearly 20 years. After his death, she enjoyed the benefits due his surviving spouse, including his veteran's pension and a Social Security pension. And, she felt at liberty to marry a third time after he died. Second, Betty would be unfairly enriched if she were allowed to disclaim the divorce and her later marriages. In 1968, in exchange for $5,000 cash, she released all of her claims to Carl's real and personal property. In this connection, she joined Carl in executing a deed to a straw party for the very purpose of giving Carl clear title to the marital home in the capacity as a "divorced man." Third, it would work a gross inequity on Carl and, through him, his collateral heirs if the person who sought to divorce him 30 years before his death and lived most of those years as another man's wife in another state was able to reappear after his death and claim the right to inherit as his spouse. It is only fair to infer from the undisputed factual record that Carl had the same misunderstanding as Betty about the efficacy of the 1968 divorce she obtained in Alabama. He pre-

sumably believed, just as the deed to his house said, that he was a divorced man and relied on that belief and his knowledge of Betty's remarriage.

The Delaware Supreme Court in *Wilson v. American Ins. Co.* outlined the three requisite elements of an equitable estoppel claim that must be proved by clear and convincing evidence:

> To establish an estoppel, it must appear that the party claiming the estoppel lacked knowledge and the means of knowledge of the truth of the facts in question, that he relied on the conduct of the party against whom the estoppel is claimed, and that he suffered a prejudicial change of position in consequence thereof.[16]

Admittedly, the circumstances of this case—particularly the unavailability of Carl as a witness—make it harder than normal to ascertain the facts needed to apply this standard fully. Nevertheless, for the reasons just described, it is fair to conclude that Carl believed both himself divorced and Betty remarried and relied on those beliefs to his detriment.[17] Certainly, there is every reason to conclude that, had Carl thought that Betty was still *his wife,* notwithstanding her subsequent remarriages and her life apart from him, he would have planned the disposition of his assets so as to prevent her taking 100 percent of his property by intestate succession. At the very least, he would have prepared a will, thus limiting her share of his estate to one-third.

The conclusion I reach is consistent with holdings of other courts that have estopped persons who remarried in reliance on a prior divorce from later contesting its validity. *In re Marriage of Gryka,* the

**16.** 209 A.2d 902, 904 (1965).

**17.** While it cannot be said that Carl lacked the means to learn the truth about the Alabama divorce and the legal infirmity of Bet-

ty's marriage to William, it is nonetheless the case that, as between Betty and Carl, she was the one with superior knowledge of what happened in Alabama and greater reason to inquire.

Appellate Court of Illinois estopped a party who had remarried from collaterally attacking a divorce decree that had incorporated a property settlement agreement with the former spouse.[18] The court stated, "It has long been held in this state that one who accepts the benefits of a divorce decree may be estopped from subsequently challenging the validity of that decree.... One such benefit has been held to be remarriage in reliance on the validity of the prior divorce decree."[19] As Professor Homer Clark noted in his article *Estoppel Against Jurisdictional Attack on Decrees of Divorce*, "The arguments supporting estoppel where there has been a remarriage are so strong that courts have been persuaded by them even where the divorce has been judicially held invalid, or where no final divorce had occurred at the time of the second marriage, or where the divorce was by mail-order, or where there was no judicial divorce at all."[20] Most certainly, this case fits within this paradigm, where the party seeking to contest the divorce relied on it remarrying twice and accepted significant benefits as a result thereof.

## B. Effect of Property Settlement Agreement as a renunciation of Betty's rights to intestate succession

■ The Administratrix also argues that Betty released her right to share in Carl's intestate estate when she signed the Property Settlement Agreement. This argument turns on the construction of that document in which Betty accepted $5,000 in return, *inter alia*, for her agreement to "release, remise and forever discharge [Carl] from all claims of whatever kind or nature from the beginning of the world to the day of the date of these presents, *resulting particularly from the marriage now existing between [them] and from any other relationship which may now or hereafter exist between [them]*, whether by agreement or under any other applicable statute of the State [of] Delaware or any other jurisdiction in the United States of America or any foreign country" (emphasis added).

■ As a general matter, "Delaware law recognizes the validity of a general release."[21] Moreover, "[i]n construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document."[22] The overall language of this document clearly evinces the parties' intent to arrange a complete property settlement between them in connection with the Alabama divorce.

As broadly worded as it is, I have no doubt that the Property Settlement Agreement was intended to encompass claims for intestate inheritance under 12 *Del. C.* § 502. This conclusion is strongly reinforced by reference to 12 *Del. C.* § 905 ("Waiver of right to elect and of other rights"). That section of the probate code states, in pertinent part, as follows:

> Unless it provides to the contrary, a waiver of "all rights" (or equivalent language) in the property or estate of a present ... spouse or a complete property settlement entered into, after or in anticipation of separation or divorce *is a ... renunciation by each of all benefits which would otherwise pass to each*

---

**18.** App.Ct. Ill., 90 Ill.App.3d 443, 45 Ill.Dec. 820, 413 N.E.2d 153 (1980).

**19.** *Id.* at 155.

**20.** 70 Yale L.J. 45, 59–60 (1960) (citations omitted).

**21.** *Adams v. Jankouskas*, Del.Supr., 452 A.2d 148, 155 (1982).

**22.** *Id.* at 156.

*from the other by intestate succession* or by virtue of any will executed before the waiver or property settlement. (Emphasis added.)

Betty argues that she should not be bound by her agreement to renounce the benefits to be derived from the laws of intestate succession because there is no record that she was treated fairly in connection with the Property Settlement Agreement. Among other things, she claims that Carl was the dominant party in the relationship, that Carl was represented by counsel but she was not, and that she was uninformed about either her rights in the relationship or the scope of the marital assets.[23]

■ The Delaware Supreme Court has recognized that a person in the position of Carl or his estate ordinarily has the burden of proving that the Property Settlement Agreement was fair and equitable.[24] This is so because, in the context of the marital relationship, "equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites." [25]

Normally, I would conclude that the Administratrix has not carried her burden of proof, as there is little or nothing in the record from which to conclude that the terms of the property division between Betty and Carl were fair and equitable. But this case presents the unique and troubling aspect that Betty waited more than 30 years—and until Carl died—before she first asserted any claim to a greater share of property, thus, putting in issue the fairness of the Property Settlement Agreement.

In the circumstances, there is compelling reason to conclude that Betty is guilty of laches in asserting her rights to a greater share of the marital property and that her laches should prevent her from now attacking—or forcing the Administratrix to prove—the fairness of the Property Settlement Agreement. This is so because Betty (i) at all times knew or should have known the circumstances surrounding the execution of the Property Settlement Agreement, (ii) delayed unreasonably in bringing suit to vindicate her rights, and (iii) by waiting as long as she did, deprived the Administratrix of the means to carry her burden of proving the fairness and equity of the arrangement.[26] Because

23. Betty also argues for an unreasonable construction of the agreement limiting it to claims that had already ripened to maturity as of June 24, 1968 and, thus, excludes her claim under the intestate succession statute. I conclude that this construction is inconsistent with 12 *Del. C.* § 905, which requires that I construe the Property Settlement Agreement as a renunciation of Betty's rights under the intestate succession laws as Carl's spouse.

Betty's answering brief also suggests that her right to distribution under 12 *Del. C.* § 502 is "an absolute right," citing *Pike v. Satterthwaite. Pike*, however, applied to surviving spouse's allowance under § 3876 of the Revised Code of 1935 (now 12 *Del. C.* § 2308). While later cases, such as *Golden* have broadened the language in *Pike* to include the general category of statutory grants

of sums of money to surviving spouses, as noted above, *Golden* goes on to hold that these rights are not absolute. *Golden*, rpt. at 13.

24. *Robert O. v. Ecmel A.*, Del.Supr., 460 A.2d 1321, 1323 (1983).

25. *Id.* (quoting *Peyton v. William C. Peyton Corp.*, Del.Supr., 7 A.2d 737, 747 (1939)).

26. Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 11–5[b], at 11–41 (2000) (citing *Wacht v. Continental Hosts, Ltd.*, Del.Ch., C.A. No. 7954, 1993 WL 315461, Chandler, V.C. (Aug. 5, 1993); *Porach v. City of Newark*, Del. Ch., C.A. No. 16578, 1999 WL 458624, Lamb, V.C. (June 25, 1999)).

Betty delayed so long in challenging the fairness of the Agreement and her delay worked such severe prejudice on Carl and his estate, equity and good conscience requires that I give effect to the Property Settlement Agreement as a renunciation of Betty's rights to intestate succession.

\* \* \*

I note also the fundamental unfairness that would result if Betty was permitted both to disclaim her divorce and remarriage and to avoid the effect of her agreement, made over 30 years ago, to renounce her statutory right to intestate succession to Carl's estate. She lived her life since 1968 as though she were divorced from Carl and fully enjoyed the benefits of that divorced status. Now that Carl is dead and her marital *duties* to him terminated extra-judicially, it is too late for her to assert her *rights* as his spouse. Rather, between Betty and Carl, equity and good conscience dictates that they be left where they put themselves and treated as though their marriage was dissolved in 1968.

### III.

For the reasons stated, petitioner's motions for summary judgment is GRANTED and respondent's cross-motion for summary judgment is DENIED.

