WILLIAM F. LONG, Defendant Below, Plaintiff-in-Error, v. THE STATE OF DELAWARE, Plaintiff Below, Defendant-in-Error.

(*March* 31, 1949.)

HARRINGTON, Ch., RICHARDS, C. J., CAREY and PEAR-SON, J. J., sitting.

*Stephen E. Hamilton, Jr.,* for defendant below, plaintiff-in-error.

*C. Edward Duffy,* Chief Deputy Attorney-General, for the State of Delaware, defendant-in-error.

Supreme Court of Delaware.

PEARSON, J., delivering the opinion of the court:

The defendant Long was married to his first wife in Wilmington, and resided there with her for thirty years prior to their separation in October 1945. On September 21, 1946, he went to Arkansas. He had been pensioned from the police force, and had been in bad health for a number of years. He testified that he went to Arkansas on account of his health because he "thought it would be a better climate"; also that he went there to obtain a divorce; and that he intended "to leave Delaware permanently and take up a permanent domicile in Arkansas". His health improved there. He returned to Wilmington for a few days in November "for business reasons" and spent the Christmas holidays in Wilmington. On December 3, he renewed his Delaware automobile registration for six months ending June 30, 1947. He remained in Arkansas for the statutory period of residence required for divorce in that state, and instituted divorce proceedings against his wife in the Chancery Court of Garland County. On January 7, 1947, that court entered a decree of absolute divorce. The decree recites publication of a notice and the mailing of a registered letter with a copy of the complaint to defendant's wife, a nonresident of Arkansas. She did not appear in the proceeding. She testified before the lower court here that she was not "served with any divorce papers" and did not receive any mail or a registered letter from Arkansas. On the same day the divorce decree was granted, defendant left Arkansas and returned to Wilmington where he has since resided. While in Wilmington during the Christmas holidays of 1946, he had been offered a job in a hospital there. He accepted this job after the divorce decree was granted and began work on January 13, 1947. On January 25, he was married to a second wife in Wilmington. This marriage was the subject of the bigamy prosecution under Rev. Code of Del. Sec. 5254. Defendant contends that the court

below was required to recognize the Arkansas decree because of the provisions of a Delaware statute, 45 Laws of Del. Chap. 225, p. 906; that recognition of the decree was required under the full faith and credit clause of the Federal Constitution, article 4, § 1; that even if not required to do so, the court should have recognized the decree on the ground of comity; that the court erred in charging the jury with respect to the time when domicile of defendant in Arkansas was required in order that the Arkansas decree be recognized as valid; that the court erred in excluding evidence of a reasonable mistake by defendant in the application of law to the facts, and in rejecting other testimony.

The statute which defendant says required the court below to recognize the Arkansas decree provides as follows, 45 Laws of Del. p. 906: "3525. Sec. 29. Decrees of Foreign Courts: Full Faith and Credit Given to:—Full faith and credit shall be given in all the Courts of this State to a decree of annulment of marriage or divorce by a court of competent jurisdiction in another State, territory, or possession of the United States. Nothing herein contained shall be construed to limit the power of any Court of this State to give such effect to a decree of annulment or divorce by a court of a foreign country as may be justified by the rules of international comity."

■■■ Defendant contends that recognition of a foreign divorce decree by our courts is mandatory "so long as the Court rendering it was 'a Court of competent jurisdiction' and that these words are words of art and mean a court competent to pass upon divorce matters." He refers to cases in which the expression "a court of competent jurisdiction" has been construed to mean a tribunal duly constituted to adjudicate cases of a certain class. Conceding that the expression has been and may be properly so used, we do not agree that in its present context it must be con-

strued as prescribing a single criterion for the recognition of foreign divorces; namely, whether the court which granted it was a duly constituted divorce court.

Defendant says, however, that the history of the statute and its legislative setting necessitate this construction. The statute amended a former act, Rev. Code, Sec. 3525, which reads thus:

"3525 . Sec. 29. Decrees of Foreign Courts; Full Faith and Credit Given to, When; Divorce Secured by Inhabitant of This State in Foreign Court for Cause Arising While Residents of This State or for Cause Not Competent in This State; Without Force in This State:—Full faith and credit shall be given in all the Courts of this State to a decree of annulment of marriage or divorce by a court of competent jurisdiction in another State, territory, or possession of the United States *when the jurisdiction of such Court was obtained in the manner and in substantial conformity with the conditions prescribed in Sections 8, 9, 10 and 11 of this Chapter.* Nothing herein contained shall be construed to limit the power of any Court to give such effect to a decree of annulment or divorce by a court of a foreign country as may be justified by the rules of international comity: *Provided, that if any inhabitant of this State shall go into another state, territory or country in order to obtain a decree of divorce for a cause which occurred while the parties resided in this State, or for a cause which is not ground for divorce under the laws of this State, a decree so obtained shall be of no force or effect in this State.*" [1] (Italics are added.)

---

[1]The sections 8, 9, 10 and 11 referred to read as follows:

"Sec. 8. Annulment of Marriage; Jurisdiction, How Acquired:— For purposes of annulment of marriage, jurisdiction may be acquired by personal service upon the defendant within this State, when either party is a bona fide resident of this State at the time of the commencement of the action.

Omitting the clauses in italics, the text of the old act is the same (with an unimportant exception) as the present act. Referring to the old act, defendant contends that:

"* * * The sections mentioned after the words 'when the jurisdiction of such Court was obtained in the manner and in substantial conformity * * *' have to do with the acquisition of real interstate or international jurisdiction. They talk about bona fide residence for a certain length of time; they talk about publication when personal service can not be had and the residence requirement prerequisite to publication and have to do generally with the type of facts necessary to establish a jurisdiction to make a divorce decree invulnerable to collateral attack. Now this very sig-

---

"Sec. 9. Divorce; Jurisdiction How Acquired:—For purposes of divorce, either absolute or from bed and board, jurisdiction may be acquired by personal service upon the defendant within this State, under the following conditions:

"(a) When, at the time the cause of action arose, either party was a bona fide resident of this State, and has continued so to be down to the time of the commencement of the action; except that no action for absolute divorce shall be commenced for any cause other than adultery or bigamy, unless one of the parties has been for the two years next preceding the commencement of the action a bona fide resident of this State.

"(b) When, since the cause of action arose, either party has become, and for at least two years next preceding the commencement of the action has continued to be, a bona fide resident of this State: Provided that the cause of action alleged was recognized in the jurisdiction in which such party resided at the time the cause of action arose, as a ground for the same relief asked for in the action in this State.

"Section 10. Jurisdiction Acquired by Publication; When; How:— When the defendant cannot be served personally within this State, and when at the time of the commencement of the action the plaintiff is a bona fide resident of this State, an alias summons shall issue to the second term next after issuing the original writ, and the sheriff shall serve the said alias summons personally if the defendant can be personally served at least four weeks prior to the return day of such alias writ. If the defendant cannot be served personally within this State, in such case the sheriff shall publish the said alias summons for one month in such newspapers of the county, one or more, as he may judge best for giving the defendant notice; provided, however,

270

nificant phrase was deleted and I do not see how it can be said that the deletion of such important language had no effect at all.

"* * * Before the deletion from the statute, Delaware had the right to independently determine the presence of domicile, Ainscow v. Alexander, [infra]. Cf. *Williams v. North Carolina*, 325 *U.S.* 226, 65 *S.Ct.* 1092, 89 *L.Ed.* 1577, 157 *A.L.R.*, 1366. By the deletion, the legislature obviously reduced the prerequisites to recognition—what other change in the existing law could have been effected?"

 The inference which defendant draws from the deletion of the first clause in italics is certainly not necessary in order to give effect to the deletion. The deleted clause directed recognition of a divorce decree of a court of another state when the jurisdiction of such court was ob-

that personal service at any time prior to the return day of the writ shall be sufficient to give jurisdiction. The case may then proceed to trial with or without the defendant's appearance, subject to the provisions of the next succeeding section.

"Sec. 11. Publication to Be Followed by Notice to Defendant Without the State; Conditions Stated:—When the defendant cannot be served personally within this State, and when at the time of the commencement of the action the plaintiff is a bona fide resident of this State, jurisdiction for the purpose of divorce, whether absolute or from bed and board, may be acquired by publication as hereinbefore provided, to be followed where practicable by service upon or notice to the defendant without this State, under the following conditions:

"(a) When, at the time the cause of action arose, the plaintiff was a bona fide resident of this State, and has continued so to be down to the time of the commencement of the action; except that no action for absolute divorce shall be commenced for any cause other than adultery or bigamy, unless the plaintiff has been for the two years next preceding the commencement of the action a bona fide resident of this State.

"(b) When, since the cause of action arose, the plaintiff has become, and for at least two years next preceding the commencement of the action has continued to be, a bona fide resident of this State: Provided that the cause of action alleged was recognized in the jurisdiction in which the plaintiff resided at the time the cause of action arose, as a ground for the same relief asked for in the action in this State." (*Rev. Code* 1935, §§ 3504, 3505, 3507; § 3506, as amended by 43 *Del. Laws*, c. 205).

tained "in the manner and in substantial conformity with the conditions" of specified Delaware statutes which provide requirements concerning divorce proceedings in Delaware. It thus adopted certain methods of obtaining jurisdiction for Delaware divorces as standards for the recognition of divorces granted in other states. We think the effect of the deletion of the clause is that recognition of divorces of other states is no loger conditioned upon jurisdiction having been obtained *"in the manner and in substantial conformity with"* the indicated conditions for Delaware divorces. In other words, just because jurisdiction was not obtained in accordance with the particular conditions prescribed for a Delaware divorce is not a sufficient reason to decline recognition of a divorce granted in another state. This does not mean that divorces of other states must be recognized without regard to whether the divorcing courts had jurisdiction to grant them. It is a rudimentary principle of conflict of laws that to be entitled to recognition in another state, a judgment must meet basic jurisdictional requisites, and is subject to collateral attack on these grounds in a court of another state. *Restatement of Conflict of Laws*, §§ 430, 429; *Goodrich on Conflict of Laws, p.* 459. Lack of jurisdiction may be applicable to the person of the defendant or the subject matter of the suit. With reference to divorce, a state cannot properly exercise through its courts jurisdiction to entertain a divorce proceeding when neither spouse is domiciled in the state. *Restatement of Conflict of Laws*, § 111; *Ainscow v. Alexander,* 28 *Del.Ch.* 545, 39 *A.* 2d 54. Under defendant's construction of our statute, recognition of a divorce granted in another state is mandatory, provided only that the court of the other state be a duly constituted divorce court. However, he is forced to concede that unless the other court had jurisdiction over the person of the defendant, the divorce need not be recognized. We are at a loss to find anything in the statute

which suggests distinguishing between jurisdiction over the person and jurisdictional requisites of domicile. In any event, our statute must be construed in the light of the elementary and long-established principles mentioned above. As thus construed, we think that jurisdiction over the person and domicile of at least one of the spouses are still requisites for recognition of a divorce decree of another state, and that there is not enough in the statute, its history or setting to override that construction. Accordingly, we hold that the court below correctly ruled that it was not required by the statute to recognize the Arkansas decree without reference to the question of domicile.

Defendant next urges that the full faith and credit clause requires recognition of the Arkansas decree, under the authority of *Sherrer v. Sherrer*, 334 *U.S.* 343, 68 *S.Ct.* 1087, and *Coe v. Coe*, 334 *U.S.* 378, 68 *S.Ct.* 1094. He says that although defendant's first wife "did not enter a general appearance before the Arkansas Court, she is in exactly the same legal position as if she had appeared generally, for fault or misconduct of the absent spouse is fully equivalent to a general appearance", citing *Restatement of Conflict of Laws* § 113(a) (ii) ; *Delanoy v. Delanoy*, 216 *Cal.* 27, 13 *P.2d* 719, 86 *A.L.R.* 1321, among other authorities. Defendant says that here, the "fault or misconduct" of his wife, "the absent spouse", was adultery occurring before he went to Arkansas. The fallacy of the argument is apparent. None of the authorities cited support the proposition that if one spouse is guilty of fault or misconduct, the other may obtain a divorce in a state in which neither party has ever been domiciled prior to the divorce, and that such a divorce is entitled to full faith and credit in other states. The rule concerning fault or misconduct of a spouse has no application except where the wronged spouse acquires a new domicile (a point certainly not conceded here) ; and then, the fault or misconduct is not equivalent to a general ap-

pearance of the absent spouse, but merely authorizes a court of the state of the new domicile to grant a divorce upon compliance with the due process requirements of notice to the absent spouse and opportunity to be heard. The lower court did not err in failing to hold that the full faith and credit clause required recognition of the Arkansas decree.

With respect to defendant's argument on the ground of comity, we know of no doctrine of comity which forbids inquiry into the jurisdiction of a foreign court, including the jurisdictional requisites concerning domicile in divorce cases. Consequently, there was no error in failing to recognize the decree on this ground.

Defendant contends that, in any event, the court below "erred in charging the jury that defendant had to have a domicile in Arkansas at the date of the decree." The court charged, in part, as follows:

"Summarizing briefly, gentlemen, the Arkansas divorce obtained by the defendant while valid in the State of Arkansas would not be valid in this State, and this Court would not give full faith and credit thereto, unless at the time it was rendered the defendant in this action, who was the plaintiff in the divorce action in Arkansas, was in fact a bona fide resident of that State at the time the decree in divorce was rendered; that is, that he was domiciled there in the sense that we have defined domicile to you—that is, that he intended to establish his home there and remain there for an indefinite period of time. * * *

"The burden of proof then changes to the defendant to satisfy you * * * from all the evidence that he was domiciled in Arkansas at the time his decree in divorce was rendered; that is, on January 7, 1947. * * *

"* * * you must be satisfied from all the evidence that the defendant was domiciled, as we have defined that term

to you, in Arkansas at the time his decree in divorce was rendered."

These statements of the time when domicile in Arkansas was important from the standpoint of recognition of the decree in Delaware may well have been due to dictum of Mr. Justice Murphy in his concurring opinion in *Williams v. North Carolina,* 325 *U.S.* 226, 242, 65 *S.Ct.* 1092, 1101, 89 *L.Ed.* 1577, 157 *A.L.R.* 1366. We think the correct rule is that in so far as recognition of the divorce by courts of Delaware is concerned, the jurisdictional requirement of domicile in Arkansas relates only to the time when the divorce action was begun, without regard to where defendant was domiciled when the decree was entered. *Ainscow v. Alexander,* 28 *Del.Ch.* 545, 39 *A.* 2d 54, 56; *Schillerstrom v. Schillerstrom, (N.D.)* 32 *N.W.* 2d 106, 2 *A.L.R.,* 2d 271; *Restatement of Conflict of Laws,* § 110, 27 *C.J.S., Divorce,* § 74, pages 637, 638. The court's instructions quoted above were therefore erroneous. We are not unmindful of the inference of absence of intent at any time to make Arkansas his home, which arises from defendant's returning to Delaware the very day the divorce was granted. However, the evidence by no means excludes the possibility that when he went to Arkansas, he intended to remain there, did not intend to return to Delaware, and that he thereupon established a home, and hence domicile, in Arkansas. On the other hand, there was testimony which might have led the jury to believe that defendant later changed his mind and decided to return to Delaware. Under these circumstances, the court's instructions to apply the "intent" test of domicile as of the date of the decree were manifestly prejudicial to the defendant.

Lastly, error is assigned for the refusal of the lower court to receive evidence relating to adultery of defendant's first wife, and relating to defendant's mistake in applying

law to the facts with respect to the validity of the Arkansas divorce. In his brief, defendant makes the following statement of facts in this connection:

"Prior to the defendant's decision to go to Arkansas he discussed the question of securing a divorce with a Delaware attorney (not his present attorney). Shortly prior to that time he had been advised by certain men, * * * that they had lived in adultery with defendant's wife. The evidence would have borne out these facts and shown with specificity by the men themselves that they had registered at certain Wilmington hotels and the names under which they had registered and that sexual relations were had. These facts were known to the Delaware attorney. In his discussion with the Delaware attorney he stated he was 'fed up with Wilmington' and that his health had been bad and that he wanted to get away. He also stated, upon being advised that he could get a divorce in Delaware, that he did not want to further embarrass his children by getting a divorce on the ground of adultery, especially since a number of them had just come out of the service and were attempting to make their way in Wilmington.

"He was advised by the Delaware attorney to go to Arkansas for the divorce and that it would be 'just as good as if obtained in Delaware.' He was advised and knew that he could secure a divorce in Delaware for approximately one-tenth of the total cost in Arkansas. * * *

"* * * After he had returned from Arkansas he decided to remarry, which marriage is the basis for the present prosecution. Before deciding on marriage, he went to the same Delaware attorney and inquired whether he was free to remarry and whether the divorce was good in view of the fact that he had returned to Delaware and changed his intention of living in Arkansas for an indefinite period of time. He was advised that the divorce was good and that

he was free to remarry. He then made arrangements with the Reverend Harris for the marriage. Reverend Harris, due to hearsay statements he had read in the newspapers, was suspicious of the validity of the divorce in Arkansas. The Reverend Harris decided, after conferring with the defendant, to visit the Delaware attorney himself and, upon doing so, was advised that the divorce was good and the defendant was free to remarry.

"The defendant conferred a final time with his attorney before applying for a marriage application and defendant's Delaware counsel appeared with him and signed his second marriage application as guarantor in the Office of the Clerk of the Peace for New Castle County. He also offered evidence to the Clerk of the Peace that he was legally divorced and free to remarry."

The evidence of adultery of defendant's first wife was excluded on the ground of irrelevancy. One of the purposes of the offer of this testimony was to show defendant's state of mind when he left Delaware; specifically that this was a reason why he did not wish to remain here but rather desired to go away and live elsewhere. Needless to say, such an inference would not be compelled by the offered testimony. Nevertheless, we think it not too remote to be of value as a circumstance from which the jury might infer defendant's state of mind with respect to his residence in Arkansas. The evidence should have been admitted for this purpose.

The evidence of defendant's consulting an attorney and following his advice was refused on two grounds: (1) that it is "not proper to presume, in view of the bigamy statute and the exceptions thereto that our Legislature intended that other and additional exceptions be extended by the Courts of this State"; and (2) that defendant's mistake was one of law, and is a case "to which the maximum 'ignorantia juris

non excusat' applies." Numerous authorities are cited by the court.

 Taking up the first ground, the statute defining the crime of bigamy provides, Rev. Code, § 5254: "Bigamy; Penalty; Inhabitant Going Out of State and Contracting Marriage With Intent to Return, Contrary to This Section, Liable to Prosecution:—Whoever, having contracted marriage, shall, in the lifetime of his or her husband or wife, marry with another person, or if any unmarried person shall marry with a person having at the time a husband, or wife living, and such fact be known to such unmarried person, he or she shall be deemed guilty of bigamy, and shall be fined not less than four hundred nor more than two thousand dollars, and shall be imprisoned for not less than three months nor more than six years. * * *"

The next section of the Code makes it a crime to cohabit after conviction of bigamy, and continues, Rev. Code, § 5255: "* * * But no person shall be convicted of bigamy, if the husband, or wife, at the time of the second marriage, shall have been absent for five years, and during that time the accused shall have received no intelligence of his or her being alive, or if there shall have been other good ground to believe the former husband or wife dead, or if the former marriage have been legally dissolved."

Of course, the mere specification of certain defenses in § 5255 does not exclude all other defenses. We can think of no sound reason why defenses of coercion and insanity, for instance, should not be available. A recognition of mistake of fact as a defense is found in *Reg v. Tolson*, 23 *Q.B.D.* 168, referred to by this court as "a great leading English case" in *Brown v. State*, 7 *Penn.* 159, 74 *A.* 836, 25 *L.R.A.* (*N.S.*) 661. There, the defense of absence of a spouse for seven years, specified in a bigamy statute, was held not to exclude a defense of reasonable mistake of fact

where the accused, believing erroneously but on reasonable grounds that her husband was dead, had remarried after his absence for less than seven years. The defense of mistake of fact is important only because it negatives a "criminal mind", general criminal intent. Keedy: *Ignorance and Mistake in the Criminal Law*, 22 *Harv. Law Rev.* 75, 82. Upon considering the particular behavior defined as criminal, compare Brown v. State, *supra,* the specified defenses themselves, and the seriousness of the punishment provided, we accept the view that the statute does not exclude as a defense the absence of general criminal intent; that is, the intent to do what would constitute a crime if the surrounding circumstances were such as a reasonable man in the defendant's position would likely believe them to be (the criminality of the defendant's subjective state of mind being measured by an objective standard) Compare Sayre: *The Present Signification of Mens Rea in the Criminal Law, Harvard Legal Essays* (1934) 399, 413; *Reg v. Tolson, supra, p.* 181.

We turn now to the ground that this is a case to which the ignorance of law maxim applies. In many crimes involving a *specific* criminal intent, an honest mistake of law constitutes a defense if it negatives the specific intent. *State v. Pullen,* 3 *Penn.* 184, 50 *A.* 538 (larceny) ; *State v. Collins,* 1 *Marv.* 536, 41 *A.* 144 (embezzlement) ; see list of cases in the Keedy article, *supra,* at p. 89; also Perkins: *Ignorance and Mistake in Criminal Law,* 88 *Uni. of Pa. Law Rev.* 35, 45, 46. As to crimes not involving a specific intent, an honest mistake of law is usually, though not invariably, held not to excuse conduct otherwise criminal. Perkins article, pp. 41-45 and cases cited. A mistake of law, where not a defense, may nevertheless negative a general criminal intent as effectively as would an exculpatory mistake of fact. Thus, mistake of law is disallowed as a defense in spite of the fact that it may show an ab-

sence of the criminal mind. The reasons for disallowing it are practical considerations dictated by deterrent effects upon the administration and enforcement of the criminal law, which are deemed likely to result if it were allowed as a general defense. As stated in the Perkins article, *supra,* p. 41: "* * * But if such ignorance were available as a defense in every criminal case, this would be a constant source of confusion to juries, and it would tend to encourage ignorance at a point where it is peculiarly important to the state that knowledge should be as widespread as is reasonably possible. In the language of one of the giants of the profession, this is a point at which 'justice to the individual is rightly outweighed by the larger interests on the other side of the scales'." Quoting from Holmes: The Common Law, p. 48.

Similar considerations are involved when we disallow ignorance or mistake of law as a defense to a defendant who engages in criminal conduct (even though not obviously immoral or anti-social) where his ignorance or mistake consists merely in (1) unawareness that such conduct is or might be within the ambit of any crime; or (2) although aware of the existence of criminal law relating to the subject of such conduct, or to some of its aspects, the defendant erroneously concludes (in good faith) that his particular conduct is for some reason not subject to the operation of any criminal law. But it seems to us significantly different to disallow mistake of law where (3) together with the circumstances of the second classification, it appears that before engaging in the conduct, the defendant made a bona fide, diligent effort, adopting a course and resorting to sources and means at least as appropriate as any afforded under our legal system, to ascertain and abide by the law, and where he acted in good faith reliance upon the results of such effort. It is inherent in the way our legal system functions that the criminal law consequences of any

particular contemplated conduct cannot be determined in advance with certainty. Not until after the event, by final court decision, may the consequences be definitely ascertained. Prior to the event, the ultimate that can be ascertained about the legal consequences consists of predictions of varying degrees of probability of eventuation. Hence, in the sense in which we are concerned with the expression, a "mistake of law" of the second or third classification refers to the failure of predictions of legal consequences to come to pass. No matter how logical, plausible and persuasive may be the bases for a prediction (assumptions, abstract legal rules, reasoning, etc.,) a mistake of law arises if the prediction does not eventuate; and there is no mistake of law if the prediction eventuates.

With these thoughts in mind, let us examine how the considerations which justify the rejection of a mistake of the first and second classifications operate with respect to a mistake of the third classification. The objection of tending to "encourage ignorance" of the law would hardly seem applicable. The very conditions of the third classification include a diligent effort, in good faith, by means as appropriate as any available under our legal system, to acquire knowledge of the relevant law. The objection of difficulties of proof, including facilitation of subterfuge, is applicable, if at all, in a far less degree than in the case of mistakes of the first and second classifications. For them, the facts are essentially confined to the defendant's subjective state of mind. The conditions of the third classification are not so limited. They include an affirmative showing of effort to abide by the law, tested by objective standards rather than the defendant's subjective state of mind.

Any deterrent effects upon the administration of the criminal law which might result from allowing a mistake of the third classification as a defense seem greatly out-

weighed by considerations which favor allowing it. To hold a person punishable as a criminal transgressor where the conditions of the third classification are present would be palpably unjust and arbitrary. Most of the important reasons which support the prohibition of ex post facto legislation are opposed to such a holding. It is difficult to conceive what more could be reasonably expected of a "model citizen" than that he guide his conduct by "the law" ascertained in good faith, not merely by efforts which might seem adequate to a person in his situation, but by efforts as well designed to accomplish ascertainment as any available under our system. We are not impressed with the suggestion that a mistake under such circumstances should aid the defendant only in inducing more lenient punishment by a court, or executive clemency after conviction. The circumstances seem so directly related to the defendant's behavior upon which the criminal charge is based as to constitute an integral part of that behavior, for purposes of evaluating it. No excuse appears for dealing with it piecemeal. We think such circumstances should entitle a defendant to full exoneration as a matter of right, rather than to something less, as a matter of grace. Unless there be aspects of the particular crime involved which give rise to considerations impelling a contrary holding,—some special, cogent reasons why "justice to the individual is rightly outweighed by the larger interests on the other side of the scales"—a mistake of the third classification should be recognized as a defense.

We find nothing about the crime of bigamy under our statute which calls for a contrary holding. As previously decided, an absence of general criminal intent is a defense to this crime. As to the acts involved in the crime, remarriage is obviously neither immoral nor anti-social in our culture. These aspects lie in the circumstance that the defendant has a spouse living from whom a divorce has not been obtained which our courts will recognize as valid. The

matters to which a mistake of law might relate are legal questions concerning marriage and divorce. It is a gross understatement to say that such questions are more frequently perplexing than obvious to a layman. For these reasons, the defense seems appropriate and we hold it available in prosecutions for bigamy. Compare *Squire v. State,* 46 *Ind.* 459; *State v. Cain,* 106 *La.* 708, 31 *So.* 300; *Baker v. State,* 86 *Neb.* 775, 126 *N.W.* 300, 27 *L.R.A.* (*N.S.*) 1097.

 Here, from the evidence rejected by the lower court, the jury might have found substantially as follows: (1) that prior to his second marriage, defendant consulted a reputable Delaware attorney for the purpose of ascertaining whether such marriage would be lawful or unlawful in Delaware, and so that he might abide by the law; (2) that the attorney advised him that the proposed remarriage would not be unlawful; (3) that he relied on this advice, honestly believing his remarriage lawful; (4) that his efforts to ascertain the law were at all times diligent and in good faith, not by way of subterfuge, and such that there was no better course for ascertaining the law than that which he followed; and hence, that he made a full disclosure to the attorney of the relevant circumstances as well as of what he proposed to do, and that he had no substantial reason to believe that the advice received was ill-founded, such as circumstances reasonably indicating that the attorney was incompetent to give advice about this matter, or had not given the question sufficient consideration, or that the advice was lacking in candor. Assuming that the Arkansas decree be held invalid here, such findings would constitute a defense to the present charge as a mistake of law of the third classification. They would meet the test of bona fide, diligent efforts, as well designed to accomplish ascertainment of the law as any available under our system. The conditions indicated furnish safeguards against pretext and fraud. The defendant would have the burden of demonstrating that his

efforts were well nigh exemplary. It would not be enough merely for him to say that he had relied on advice of an attorney, unless the circumstances indicated that his conduct throughout in seeking to ascertain the law and in relying on advice received manifested good faith and diligence beyond reproach. We see no occasion to assume that recognizing such a defense would foster dishonest practices among attorneys. These might well be expected to be deterred by the availability of disciplinary measures for non-professional conduct. Moreover, although erroneous advice might save a defendant from criminal responsibility for acts in reliance on it, the same acts would in many instances incur substantial civil responsibility and financial loss. The risk of possible disingenuous resort to the defense does not seem to us sufficient to warrant withholding it from those acting in good faith. Accordingly, the evidence should have been submitted to the jury under proper instructions.

A new trial should be awarded for the reasons set forth in this opinion.

An order accordingly will be entered.