IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DELAWARE BOARD OF NURSING, | § | |
| | § | No. 69, 2018 |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| CHRISTINE MULRY FRANCIS and | § | No. N16A-10-006 |
| ANGELA L. CALDWELL | § | |
| DEBENEDICTIS, | § | |
| | § | |
| Appellees. | § | |

Submitted: August 22, 2018
Decided: October 2, 2018

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED**.

Carla A.K. Jarosz, Esquire, Delaware Department of Justice, Wilmington, Delaware, *Counsel for Appellant*.

Daniel A. Griffith, Esquire, Whiteford, Taylor & Preston LLC, Wilmington, Delaware, *Counsel for Appellees*.

**TRAYNOR**, Justice:

A Delaware statute provides that licensed nurses may be disciplined if they engage in "unprofessional conduct." The statute does not define "unprofessional conduct," so the Delaware Board of Nursing adopted a rule to flesh the term out. Under the Board's rule, "[n]urses whose behavior fails to conform to legal and accepted standards of the nursing profession and who thus may adversely affect the health and welfare of the public may be found guilty of unprofessional conduct."

Two nurses who held supervisory roles at a correctional facility were disciplined by the Board under that rule after they participated in the retrieval of medication from a medical waste container for eventual administration to an inmate. The nurses appealed to the Superior Court, and the court set their discipline aside. The court read the Board's rule to require not just proof that the nurses breached a nursing standard, but also proof that in doing so, they put the inmate or the public at risk. And in the court's view, the State had not made that showing.

Because the Board applied the correct standard and its decision was supported by substantial evidence, its decision must be upheld. We therefore reverse the judgment below.

I

A

The Delaware Board of Nursing is a panel of fifteen individuals—ten with nursing experience and five lay members—tasked with supervising the nursing

1

profession.[1] The Board is vested with the power to adopt rules to carry out its mandate[2] and, to that end, the Board adopted a rule to define "unprofessional conduct,"[3] which is one of a number of statutorily enumerated grounds upon which a nurse can be subject to professional discipline.[4]

The rule the Board adopted has two parts. The first part—Rule 10.4.1—provides, as a general definition of unprofessional conduct, that "[n]urses whose behavior fails to conform to legal and accepted standards of the nursing profession and who thus may adversely affect the health and welfare of the public may be found guilty of unprofessional conduct."[5] The second part of the rule—Rule 10.4.2—contains a list of twenty-nine, non-exhaustive illustrations of conduct that violates that general proscription.[6]

## B

The unprofessional conduct these two nurses are charged with engaging in revolves around the administration in a correctional facility of an expensive hepatitis

---

[1]     24 *Del. C.* §§ 1901, 1903(a).
[2]     24 *Del. C.* § 1906(a).
[3]     At the time of the disciplinary proceedings, the rule was codified at 24 Del. Admin. C. § 1900-10.4.1, but the Board has since renumbered the rule to 10.1.1. 21 Del. Reg. 658, 735–37 (Mar. 2018). We will refer to it by its old numbering.
[4]     24 *Del. C.* § 1922(a)(1)–(13).
[5]     24 Del. Admin. C. § 1900-10.4.1 (old numbering).
[6]     Those illustrations have since been renumbered to 10.1.2.1 to 10.1.2.29. 24 Del. Admin. C. § 1900-10.1.2.1to 10.1.2.29. The Board also made minor changes to a few of the illustrations, 21 Del. Reg. at 737, but none of those changes are relevant here.

C medication.[7] Although we are cognizant that we are law-trained judges, not medical professionals, from our vantage point, we agree with the Superior Court that what happened to this medication was "ugly."[8]

The medication comes in pill form, and each pill costs $1,000. A full course of the medication is 28 pills, and it can be purchased only in lots of 28. The prison had ordered a course of the medication to treat an inmate and, because of its cost, subjected the medication to the same careful controls it applies to controlled substances, including periodically counting the pills.

Two nurses (not the appellees) were conducting one of those counts when one of them accidentally tipped over the bottle of pills, spilling twelve of them onto the floor. Both nurses believed that when medication comes into contact with the floor, it must be discarded, so they collected the twelve pills and disposed of them in a "sharps container"—a medical waste container designed for the disposal of skin-piercing objects, like syringes and blades. This decision to discard the pills once they hit the floor was consistent with the testimony of the appellees themselves as to what to do in this situation.[9]

---

[7]     Sofosbuvir, sold under the brand name Sovaldi.
[8]     *Francis v. Del. Bd. of Nursing*, 2018 WL 565303, at *6 (Del. Super. Ct. Jan. 23, 2018).
[9]     *See infra* at 11–12.

3

After disposing of the pills, the nurses notified the pharmacist on duty at the prison (the prison has an on-site pharmacy run by a private company) that a refill of the medication would be needed.

As some of the witnesses would later intimate, the high cost of the pills largely explains what happened next. The on-site pharmacist immediately called her supervisor, the head of the pharmacy company's Delaware operations, who in turn contacted the head physician of the separate company that furnishes the prison with patient care. The physician, who was not at the prison at the time, called one of the appellees, nurse Christine Francis, and told her to retrieve the pills from the sharps container.

Francis, the prison's health services administrator, asked nurse Angela DeBenedictis, the other appellee and the prison's director of nursing, to accompany her. After locating the waste container, the two nurses laid paper towels on a table, unlocked the container—which is normally locked until the contents can be safely disposed of—and shook it until all twelve pills had fallen out. Along with the pills came some syringes, retractable lancets, and diabetic testing strips. There was additional medical waste in the container that the twelve pills could have touched, but once all twelve pills fell out, the nurses stopped shaking the container, leaving those materials behind. No one knows—or can know—what that waste was. What is known is the sorts of things that can be found in that type of container: saturated

4

wound dressings, items soiled with more than five milliliters[10] of blood or other bodily fluids, items from patients on strict isolation, skin-piercing objects such as needles, disposable scissors, scalpels, and catheters, and other disposable equipment for internal use.

Francis and DeBenedictis wrapped the pills in a paper towel and took them to their office. There, they were met by the on-site pharmacist, and together, they looked at the pills. To the pharmacist, "there did not appear to be anything wrong with [them]"—"they looked like they came out of a bottle."[11] This eyeball test, consistent with the five-second rule some might use to determine whether to eat food dropped on the floor, is not one that any witness testified is a professionally recognized practice. No witness testified that an unaided visual inspection of pills that were in a container filled with medical waste was a professional method that could reliably determine if the pills were contaminated. Consistent with the cursory examination of the pills themselves, no one checked the floor where the pills had been spilled. Thus, none of them knew how clean or contaminated that floor was or how much the initial spill could have contaminated the pills even before they were placed into the waste container.

---

[10]     Five milliliters is about a teaspoon.
[11]     App. to Op. Br. A139.

The pills were later given to the inmate. He suffered no ill effects, but he was not told the pills had been retrieved from a medical waste container until after he had taken them. In other words, no one informed the inmate of what had happened to the pills or gave him a chance to give or deny consent or request that he receive pills not retrieved from a medical waste container.

No one—not the nurses, not the on-site pharmacist, not the head pharmacist, and not the head physician—took responsibility for deciding that the pills were fit for use. Francis, DeBenedictis, and the head physician claimed it had been one of the pharmacists, while the head pharmacist insinuated it had been the head physician. The on-site pharmacist pleaded ignorance.

## C

When one of the nurses who had disposed of the pills in the waste container learned they had been retrieved and given to an inmate, she reported it to the Delaware Division of Professional Regulation. After an investigation, the State brought disciplinary proceedings against the head physician and the two nurses, and a hearing was held before an administrative hearing officer. The nurses were charged with violating Board of Nursing Rule 10.4.1—the rules' general definition of unprofessional conduct—as well as Rules 10.4.2.14, 10.4.2.22, and 10.4.2.28, which provide the following examples of unprofessional conduct:

> 10.4.2.14   Failing to take appropriate action to safeguard a patient from incompetent, unethical or illegal heath care practice.

6

10.4.2.22     Aiding, abetting and/or assisting an individual to violate or circumvent any law or duly promulgated rule and regulation intended to guide the conduct of a nurse or other health care provider.

10.4.2.28     Failing to take appropriate action or to follow policies and procedures in the practice situation designed to safeguard the patient.[12]

At the hearing, the nurses and the head physician contended that it had been the pharmacists, not them, who decided that the pills could be given to the inmate. The pharmacists, they claimed, are the experts on whether medication is fit for use, so they were simply taking direction from the subject-matter experts. And it was reasonable to follow those instructions, they said, because even though the pills spent time in a medical waste container, there was little to no risk of disease transmission.

To back up those assertions, they called two experts to testify on their behalf: a physician certified in infectious diseases and a nurse with decades of experience in prison health care.

The physician testified first. In his view, it was "reasonable [for the physician and the nurses] to accept a pharmacist's determination that [the] pills were safe, effective and okay for human use."[13] As for whether the pills—post inspection by

---

[12]     These rules are currently codified at 24 Del. Admin. C. § 1900-10.1.2.14, .22, and .28.
[13]     App. to Op. Br. A300–01.

the on-site pharmacist—posed a risk to the inmate, he testified that the risk was "incalculably small."[14]

But his testimony rested on a key premise: he assumed "not only [that] the pills were inspected [after being recovered from the waste container], but [that] the contents of the Sharps Container was inspected."[15] That, he said, was "critical" because "if there were free liquids in the Sharps Container . . . [or] dust . . . [or] other compounds . . . , you can infer that the pills came in contact with those and were contaminated in a real and consequential sense."[16] He also testified that it would have been critical to "know what was on the floor where the pills were dropped, such as dirt, fluids, and the like."[17]

Just before he left the stand, the State's attorney asked him, in light of how he had downplayed the risk the pills posed, whether he would have taken them. His reaction to that question left an impression on the hearing officer, who made a point in his post-trial report to describe the exchange:

> Though I rarely comment on 'body language' or other witness behaviors . . . , I should say that there was a palpable delay before Dr. Axelsen answered that question. He then stated that he 'thinks' he would have ingested the pills.[18]

---

14    App. to Op. Br. A303–04.
15    App. to Op. Br. A299.
16    *Id.*
17    App. to Op. Br. A573.
18    App. to Op. Br. A574, A616; *see* App. to Op. Br. A320 (Q: "Would you ingest these pills if it were you?" A: "I think I would.").

8

The nursing expert testified next. She too believed that "it was reasonable to rely on the expertise of the pharmacist in making the decision whether or not these medications were safe to use" because they are the "subject matter experts."[19] She also agreed with the physician that the risk the pills posed was incalculably small, though she too assumed there had been "an accounting" of everything that was in the waste container—not just what tumbled out along with the pills.[20]

But in a finding the nurses do not contest, the hearing officer concluded that, contrary to the experts' assumptions, no one examined the contents of the waste container after the pills fell out, so the container's full contents "were and are currently unknown."[21] Because no one could say for sure what the pills may have encountered, the hearing officer found that giving them to the inmate was not a riskless endeavor:

> [The nurses were] aware of the 'adventure' experienced by those pills, including their spillage on an uninspected floor and their retrieval from a used sharps container the complete contents of which were unknown to anyone. . . . In my view . . . [allowing the pills to be administered] may have adversely affected the health and welfare of the inmate.[22]

That finding also had some support from the inmate's treating physician. While he did not view the risk of disease transmission as "significant," he did not

---

[19]   App. to Op. Br. A371, A377.
[20]   App. to Op. Br. A377.
[21]   App. to Op. Br. A584.
[22]   App. to Op. Br. A629 (reaching that conclusion in DeBenedictis's case); *see* App. to Op. Br. A587 (reaching the same conclusion in Francis's case, using slightly different wording).

9

suggest that the risk was nil, and while he ultimately recommended to the inmate that he not undergo preventative treatment to guard against the risk of infection, that was only because the treatment "may [have] pose[d] more risk than benefit."[23]

As for the lingering question of who decided that the pills were fit for use, the hearing officer left that question unanswered. But he did find, consistent with testimony from both nurses, that the on-site pharmacist told them—after speaking by phone with the head pharmacist—that the pills were to be put back into inventory.[24] He also found that the head physician was in some way "involved in" that decision,[25] such that if the nurses had objected, it "could have constituted disobedience of . . . [her] directive."[26] So while the hearing officer declined to place the blame on any one person, he found that from the nurses' perspective, they were under orders from both the pharmacists and the head physician to return the pills to the bottle.

That left the hearing officer with two related questions to answer: whether the nurses' conduct violated the "accepted standards of the nursing profession," and if it did, whether the nurses' deviation from those standards was justified because of the

---

[23]     App. to Op. Br. A507.
[24]     *See* App. to Op. Br. A584 ("After the call to [the head pharmacist], [the on-site pharmacist] informed Ms. Francis and Ms. DeBenedictis that the pills would be returned to [the inmate's] count for administration to him.").
[25]     App. to Op. Br. A629.
[26]     App. to Op. Br. A587, A630.

10

pharmacist's and medical supervisor's advice and instructions. He began by acknowledging that there had been "little testimony, if any with regard to the 'accepted standards of the nursing profession' [that] applied [to] this case."[27] Nor, he pointed out, had the State "cite[d] to a specific section of the Delaware Nursing Act or regulation of the Board [that] would have provided clear and specific direction to guide [the nurses'] conduct . . . in this admittedly unique case."[28] Nevertheless, he observed that multiple witnesses had testified that the standard protocol was to discard pills that fell on the floor. For example, he noted that "Francis stated that the Department of Corrections had explicitly or implicitly adopted a standard regarding spilled medications," under which "spilled medications were to be wasted in a trash can or sharps container if they were not controlled substances"[29] and that she "learned in her nursing training that spilled pills should be wasted because of a presumption of contamination."[30] Likewise, "DeBenedictis testified that the standard procedure at [the correctional facility] was to waste non-controlled substances which fell to the floor in either trash cans or sharps containers."[31] She also testified that she "would expect [nurses she supervised] to discard spilled

---

[27]    App. to Op. Br. A586, A628.
[28]    App. to Op. Br. A588, A631.
[29]    App. to Op. Br. A586.
[30]    App. to Op. Br. A585.
[31]    App. to Op. Br. A628.

11

medications in the trash or in a sharps container"[32]—just as the two on-duty nurses

had done. And indeed, one of those two nurses testified "that she learned in nursing

school that if pills fall on the floor, they are to be placed in a sharps container because

they have become contaminated."[33] The other nurse also testified to that effect.[34]

In light of that evidence, the hearing officer found that disposing of

medication that falls on the floor is an accepted standard of the nursing profession

and that retrieving those pills from a sharps container and administering them to a

patient violated that standard. That left the hearing officer with the final question to

answer: did the fact that the nurses did those things at the direction of the pharmacist

and the head physician excuse their behavior?[35] With the knowledge that it would be

up to "the Board . . . [to] ultimately answer that question,'"[36] he opined that the

nurses were "obligated to exercise independent judgment" and should have either

objected to what was happening or taken steps to prevent it.[37] He therefore concluded

that the nurses had violated both Rule 10.4.1—the general definition of

---

[32]  App. to Op. Br. A627.
[33]  App. to Op. Br. A558, A600.
[34]  App. to Op. Br. A55 (stating she would dispose of pills in a medical waste container "[b]ecause we learned in nursing school anytime a pill falls on the floor it needs to be discarded").
[35]  *See* App. A586, A629 ("[I]f wasting of spilled medications based on a presumption of contamination or loss of integrity constitutes some form of 'standard' or expected nursing practice, does the opinion of a pharmacist in the circumstances of this case 'trump' that standard and excuse acting contrary to it?").
[36]  *Id.*
[37]  App. to Op. Br. A586–87, A629.

12

unprofessional conduct—and Rules 10.4.2.14 and 10.4.2.28, which require nurses to take appropriate action to safeguard their patients.[38]

In two short orders, the Board adopted the hearing officer's conclusions of law, placed the nurses on probation for ninety days, and required them to undergo training in pharmacology and nursing ethics. Despite the hearing officer's invitation for the Board to expound on the "accepted standard" that nurses are expected to follow in this sort of scenario, the Board's order simply adopted the hearing officer's recommendations and offered no further comment.

II

A

The nurses appealed to the Superior Court. They criticized the Board's decision in a number of respects, but their primary complaint was that there was no basis in the record to find that they violated any standard of the nursing profession. To be "unprofessional" under Rule 10.4.1, the nurses' conduct must have "fail[ed] to conform to legal and accepted standards of the nursing profession," but the State, they said, had not presented any evidence that the standards of the nursing profession require nurses to disobey direct instructions they receive from physicians or pharmacists. The only experts who testified both said it was reasonable for the nurses

---

[38]    He concluded that the State had not proven that either nurse violated Rule 10.4.2.22, which prohibits nurses from "[a]iding, abetting and/or assisting an individual to violate or circumvent any law or duly promulgated rule and regulation intended to guide the conduct of a nurse or other health care provider." App. to Op. Br. A588, A631. That part of his decision is not before us.

13

to rely on the pharmacists' judgment in this area, and the State did not present any expert evidence of its own to show that the nurses were obligated to second-guess a pharmacist—let alone the head physician.[39]

The nurses also took issue with the hearing officer's finding that the pills had put the inmate at risk. Both of their experts, they stressed, testified that the risk of contamination was incalculably small, and the State offered no evidence to the contrary. In their view, the fact that the pills posed little to no risk made the notion that they had a professional obligation to disobey the pharmacists and the head physician all the more improbable.

The Superior Court sided with the nurses, but for a reason neither side had anticipated. After considering the three rules the nurses were found to have violated, the Superior Court concluded that each of them required the State to prove—as an essential element of its case—that the nurses' behavior had caused harm. And the court agreed with the nurses that the record supplied no basis for the hearing officer to have found that the inmate had been harmed.

---

[39] *See* Op. Br. in Supp. of Appeal at 37, *Francis*, 2018 WL 565303 (No. N16A-10-1006 FWW) (framing the question before the Superior Court as whether there was "'substantial evidence' to support a Board's determination that the nurses were required to override the directives of their medical director and the pharmacists where the only evidence in the record was that there was *no* such obligation").

B

We disagree with the Superior Court's reading of the rules.[40] It is true that the need to "safeguard life and health" is at the heart of why the State reserves the power to discipline nurses who engage in unprofessional conduct,[41] but the State's concern is not limited to nurses who put the public in immediate jeopardy. The states have a "special responsibility for maintaining standards among members of the licensed professions," and to maintain the public trust in those professions, the rules that govern them often have a prophylactic bent.[42] So while the Superior Court thought that requiring nurses to protect patients from conduct that falls below professional standards—but may not pose a risk—would be an "unnecessary redundancy,"[43] we think it would be entirely consistent with the State's special interest in upholding the integrity of the profession.[44]

The Superior Court began with the general definition of "unprofessional conduct" in Rule 10.4.1. That rule, as we said, provides that "[n]urses whose behavior fails to conform to legal and accepted standards of the nursing profession

---

[40]    Ordinarily, when an interpretation of an agency's own regulations is at issue, we "defer to the construction placed [on them] by [the] agency." *Pub. Water Supply Co. v. DiPasquale*, 735 A.2d 378, 383 n.9 (Del. 1999). But because the Superior Court introduced this interpretive question into the case, neither the hearing officer nor the Board spoke to it, and neither side has pointed us to any other Board interpretations on point. That leaves us to interpret the regulations using our ordinary tools of statutory construction.

[41]    *See* 24 *Del. C.* § 1901.

[42]    *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460–64 (1978).

[43]    *Francis*, 2018 WL 565303, at *6.

[44]    *Ohralik*, 436 U.S. at 460.

15

and who thus may adversely affect the health and welfare of the public may be found guilty of unprofessional conduct." The Superior Court read the rule's two clauses to impose two separate requirements: proof that a nurse failed "to conform to legal and accepted standards of the nursing profession" and proof that the nurse endangered "the health and welfare of the public." That, the court said, means that the State must prove that there was "an adverse effect—harm—to the health and welfare of the public."[45]

But we see two problems with that reading. For one, the two clauses are not in parallel. The first clause is addressed to the nurse's behavior, while the second clause is addressed to the nurse herself. That, we think, was no accident. The Board may have rightfully concluded that a nurse who engages in standard-breaching behavior is, for that very reason, a nurse who "may adversely affect the health and welfare of the public," regardless of whether the nurse's unprofessional behavior in fact caused specific harm to the patient. The use of the word "may" has the clear intent of addressing improper behavior that may cause harm; the rule does not exempt from sanction improper behavior that creates a risk to a patient simply because the harm does not come to pass.

Consistent with this reality, our other difficulty with the court's reading is that the second clause is prefaced by "thus." As such, the clauses are not independent of

---

[45]  *Francis*, 2018 WL 565303, at *6.

16

one another, but joined to each other. The first clause, as we see it, lays down the operative rule, while the second clause justifies the rule by explaining that, in the Board's view, a standard-breaching nurse is by that very fact a nurse who may harm the public. The second clause, in other words, explains the rule's purpose, and while a statement of purpose may help illuminate a rule's meaning, a "purpose clause cannot override the operative language" or "limit a more general disposition that the operative text contains."[46] To read the rule otherwise requires breaking the two clauses into two independent requirements, and that would read the word "thus" out of the rule, as though discipline were limited to those nurses whom the State could prove had both "fail[ed] to conform to legal and accepted standards of the nursing profession *and who may* adversely affect the health and welfare of the public."

Reading a proof of actual harm to a patient requirement into Rule 10.4.1 also leads to odd results under the illustrations that follow. The Board's rule, as we mentioned, contains two parts: the general definition of unprofessional conduct in Rule 10.4.1, and the twenty-nine illustrations of unprofessional conduct that follow. If Rule 10.4.1 were to require proof that the nurse in question harmed a patient or the public, as opposed to put them at risk, so too would each of those illustrations, and that leads to some obvious problems. Take Rule 10.4.2.5. That rule says that

---

[46]      Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 219–20 (2012).

17

"unprofessional conduct" includes "[c]ommitting or threatening violence, verbal or physical abuse of . . . co-workers." But under the Superior Court's interpretation, an abusive nurse could escape discipline if the State is unable to prove that the abuse posed some risk to patient care. Or consider Rule 10.4.2.4, which forbids "falsifying or altering a patient or agency record related to patient care, employment, or licensure." With an actual harm requirement, the Board would have no power to discipline a nurse for falsifying records unless the State could prove a nexus between those records and the public's health and welfare. It would seem that the Board would even be powerless to discipline a nurse for failing to comply with one of the Board's own disciplinary rulings (Rule 10.4.2.29) absent proof that the nurse's decision to flout the Board's order posed a threat to the public. Thus, both the structure of Rule 10.4.1 and the illustrations that follow lead us to reject the notion that the rule requires proof in every case of actual harm.

Aside from Rule 10.4.1, the Superior Court also read an actual harm requirement into the two illustrations these nurses were found to have violated: Rules 10.4.2.14 and 10.4.2.28. Rule 10.4.2.14 requires nurses "to take appropriate action to safeguard a patient from incompetent, unethical or illegal heath care practice." In the Superior Court's view, this rule too "contains a harm element" because the rule "seeks to prevent harm by safeguarding the patient from unethical health care

18

practice."[47] The court, it seems to us, again relied on what it viewed as the rule's purpose to justify a narrow reading of "safeguard"—one concerned only with protecting patients from physical harm. But the rule's text is not so limited. It simply requires nurses to "safeguard" patients from exposure to "incompetent, unethical or illegal" conduct, regardless of whether that conduct puts a patient's health and welfare in jeopardy. The Superior Court thought that disciplining a nurse for failing to protect a patient from an "unethical practice where no harm has occurred . . . would allow form to prevail over substance,"[48] but we think that requiring nurses to intervene whenever they realize another practitioner is not adhering to professional standards—and thereby may be putting a patient at risk—would be a sensible prophylaxis, not a senseless formality.

Rule 10.4.2.28, finally, requires nurses to "take appropriate action or to follow policies and procedures in the practice situation designed to safeguard the patient." The Superior Court said "[t]his regulation, like the other two, requires evidence of harm" because "[t]he actions, policies, and procedures are meant to safeguard against something."[49] But it seems plain to us that if a nurse were to fail to follow a policy or procedure "designed to safeguard the patient," the nurse has violated the rule, regardless of whether the patient was actually harmed. Like Rule 10.4.2.14, this

---

[47]     *Francis*, 2018 WL 565303, at \*7.
[48]     *Id.*
[49]     *Francis*, 2018 WL 565303, at \*7.

19

rule appears to us intentionally designed to sweep broadly to ensure the policies and procedures designed to protect patients from harm—the most critical of all—are obeyed.

## C

We therefore disagree with the Superior Court's apparent finding that unless improper nursing behavior creates actual harm, it is not sanctionable under any of the Nursing Board's rules. And on this record, it is plain from the testimony of the nurses' own witnesses that they engaged in conduct, in concert with others, that put the inmate patient at risk.

When an agency adjudicates a question of fact, we are obligated to credit that finding unless it was not "supported by substantial evidence."[50] As the Superior Court saw it, the hearing officer's finding suffered not just from a lack of substantial evidence—there was no evidence for it at all:

> The only evidence of 'risk of harm' was presented by the nurses' witnesses. All three[51] confirmed the absence of harm, and the two experts testified that they would have ingested the wasted pills themselves. The State, however, presented no evidence of harm and the

---

[50]  29 *Del. C.* § 10142(d); *see also Stoltz Management Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del. 1992) ("Where there is a review of an administrative decision by both an intermediate and a higher appellate court and the intermediate court received no evidence other than that presented to the administrative agency, the higher court does not review the decision of the intermediate court but, instead, directly examines the decision of the agency. . . . On appeal from an administrative agency the reviewing court must determine whether the agency ruling is supported by substantial evidence and free from legal error.") (internal citations omitted).
[51]  The three witnesses consisted of the two experts the respondents called plus the head physician, who agreed with the two experts that the risk the pills posed was "incalculably small."

20

Hearing Officer, in his findings of fact, cited nothing for the proposition that administering wasted pills caused or was likely to cause harm.[52]

We start by reiterating something that is critical. Both of the nurses testified that they were trained that pills that fall on the floor must be discarded. This is not a small point. Both nurses knew that the risks of contamination from the floor alone justified disposal, and their own expert physician testified that inspecting that floor would be a crucial part of ensuring that the pills had not been contaminated.

The pills' journey did not, of course, end there. They ended up in a sharps container, and contrary to the Superior Court's view, there was evidence in the record—from the nurses' own expert—that giving a patient pills retrieved from an uninspected sharps container is risky. The nurses' expert physician made a point to caution that if pills are to be fished out of a waste container and given to a patient—setting aside, for a moment, the ethical implications—it would be "critical" to examine all of the contents of the container. His opinion that these pills were safe depended on that assumption, and the nurses do not dispute the hearing officer's finding that a full inspection of this container never occurred.

That, we think, provides "more than a scintilla" of support for the hearing officer's finding that the inmate had been put at risk.[53] It is true that this testimony about the risks the pills posed came from one of the nurses' experts, not the State.

---

[52]     *Francis*, 2018 WL 565303, at *6.
[53]     *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981).

21

And it is true, as the Superior Court pointed out, that the State offered no expert evidence of its own. But as trial judges routinely tell their jurors, a party can make its case with testimony from any witness "regardless of who called them."[54]

III

Because the Superior Court disposed of this case on what it saw as a threshold flaw in the State's case, the court never reached the heart of the nurses' argument: that there was no basis in the record for the hearing officer—or the Board—to find that they violated any "accepted standard" of the nursing profession because there had been no expert evidence presented of the "accepted standards" that govern when a nurse must disobey directions from a pharmacist or physician.[55] As the nurses see it, the hearing officer and the Board simply declared by fiat that it is "accepted" that nurses must disobey instructions like the ones they received, and they believe that is something the Board cannot do.

We read the hearing officer's (and, by adoption, the Board's) decision differently. As we see it, the hearing officer's analysis proceeded in two steps. First, he considered whether disposing of medication that falls on the floor (or following a facility policy to that effect) is an accepted standard of the nursing profession, and whether these two nurses violated that standard. He answered those two questions

---

[54]    Del. Pattern Jury Instructions Civ. § 4.1 (2006).
[55]    Other than the testimony of their experts, who both said that from their experience, it was reasonable for the nurses to have followed those directions.

22

in the affirmative, which meant that—within the language of the Board's rules—the nurses had "fail[ed] to conform to legal and accepted standards of the nursing profession." That conclusion, we think, had adequate support in the record, and under the plain wording of the rules, merits discipline.

But, at the nurses' urging, the hearing officer proceeded to a second step: he considered whether their breach of nursing standards should, under the circumstances, be excused. As he put it,

> Perhaps a central question in this case is whether [the nurses] could fairly rely on [the on-site pharmacist's] opinion that the spilled tablets appeared to be safe for administration. Put another way, if wasting of spilled medications constitutes some form of "standard" or expected nursing practice, does the opinion of a pharmacist in the circumstances of this case "trump" that standard or excuse acting contrary to it.[56]

When the hearing officer (and the Board) considered whether excuse was an available defense to the nurses' behavior, the Board was not being called upon to determine the accepted standards in the nursing profession that govern when nurses must disobey other medical professionals. The Board had already found that the nurses violated the accepted standards of their profession when they fished pills that had fallen on the floor out of a medical waste container so that they could be administered to a patient, so all that was left was for the Board to consider whether that violation should be excused. And expert evidence is unnecessary for the Board

---

[56]     App. to Op. Br. A586; *see* App. to Op. Br. A629.

to determine whether justification or excuse is available for a violation of its own rules. Whether and when a defense is available is a question of law, not a question of fact,[57] so it is the Board's prerogative to interpret its rules and determine whether they allow for any exceptions. And unless an agency's construction of its own rules is "clearly wrong," we "defer[] . . . to . . . [the] agency's construction . . . in recognition of its expertise in a given field."[58]

We see no error in the Board's conclusion that—at least under these circumstances—the nurses' argument that they were just following orders is no defense to their breach of the profession's standards. This is not a case where a nurse found herself in a good-faith disagreement with another professional about how to best care for a patient, which might excuse a violation of her own profession's standards in deference to another professional who the nurse believes has higher decision-making authority or subject-matter expertise. Those circumstances do not pertain here. The directive the nurses received to retrieve pills from a sharps container was not born of a divided judgment about how best to care for the inmate's condition, and administering pills that had come into contact with the floor—let alone the medical waste container—was so basic a misstep that the two on-duty

---

[57]  *See Bryson v. State*, 840 A.2d 631, 635–37 (Del. 2003) (recognizing that the defenses enumerated in the Criminal Code are not exhaustive and that others may be recognized under common law); *see also Long v. State*, 65 A.2d 489, 498 (Del. 1949) (deeming the mistake-of-law defense available to a defendant charged with bigamy).

[58]  *Div. of Soc. Servs. of Dep't of Health & Soc. Servs. V. Burns*, 438 A2d 1227, 1229 (Del. 1981) (per curiam).

24

nurses who originally discarded the pills (who did not have the same level of training as the appellees) both knew it was wrong.[59] Worse still, the record reflects that medical staff planned to keep their actions quiet and keep the patient in the dark.

So we think the Board's decision was sound to reject the nurses' plea that this was some mere clash of professional judgment that justified their decision to bow to the superior knowledge of the pharmacist or the superior authority of the physician at the expense of their own profession's standards. Nor, it is important to note, was there any medical urgency—such as a shortage of pills and no time to secure more— that might have justified a departure from the accepted standards of the nursing profession. The only urgency here was economic, and, while conserving resources is not an improper motive, we see no error in the Board's conclusion that a desire to save money did not excuse the professional breach these nurses committed.

The judgment of the Superior Court is reversed and the final order of the Board shall be affirmed.

---

[59] App. to Op. Br. A55 ("[W]e learned in nursing school anytime a pill falls on the floor it needs to be discarded."); App. A24 ("Q. So you said they fell on the floor, they would become contaminated, and then you throw them in the sharps container. Where did you learn that? A. In school. Q. What did you learn specifically? A. If we were provided the pill-dissolving solution, that's where you would drop it in. But if not, then the next best thing was to put it in the sharps container.").